213 A.2d 203 (1965)
Application of DELAWARE RACING ASSOCIATION, a corporation of the State of Delaware, for a determination, pursuant to Section 262 of the General Corporation Law of the value of certain shares of stock of The Delaware Steeplechase and Race Association.
Supreme Court of Delaware.
August 2, 1965.
*205 Vincent A. Theisen and Aubrey B. Lank, of Theisen & Lank, Wilmington, for dissenting stockholders, appellants.
William S. Potter and Charles S. Crompton, Jr., of Berl, Potter & Anderson, Wilmington, for Delaware Racing Ass'n, appellee.
WOLCOTT, Chief Justice, CAREY, Justice, and DUFFY, President Judge, sitting.
WOLCOTT, Chief Justice.
This is an appeal by stockholders of Delaware Steeplechase and Race Association (Steeplechase) from a judgment of the Vice Chancellor in an appraisal proceeding fixing the value of the Steeplechase stock.
Delaware Racing Association (Racing) filed a petition for an appraisal of the value of Steeplechase shares. Steeplechase, on July 31, 1963, under the provisions of 8 Del.C., § 253, had been merged into Racing. Stockholders of Steeplechase owning 77 common shares of the 1519 outstanding were determined to be entitled to an appraisal. The Vice Chancellor appointed an Appraiser who submitted a final report fixing the per share value of Steeplechase stock at $3,472.90. To this report both Racing and the stockholders filed exceptions. The Vice Chancellor fixed the per share value of Steeplechase at $2,321.30. This appeal followed.
A brief summary of the factual background is required. Steeplechase, between *206 1937 and July 31, 1963, owned and operated, with the exception of 1943, Delaware Park near Stanton, Delaware, a track for thoroughbred horse racing. On-track pari-mutuel betting was carried on with a percentage of the pool going to the State in the form of a tax, and a percentage of the pool going to Steeplechase in the form of earnings. Pari-mutuel betting within the enclosure of a licensed horse race meet is permitted by a 1935 amendment to Article II, § 17 of the State Constitution, Del.C. Ann. which theretofore had prohibited all gambling. Authority to control the carrying on of horse racing for stakes or purses was granted to the Delaware Racing Commission by 28 Del.C., §§ 301-366.
The authority thus granted to the Racing Commission is broad. It embraces licensing of race meetings, control over the actual conduct of racing, regulation of all charges made by a licensee, approval of proposed physical additions to a racing plant, supervision over the keeping of a licensee's books and records, control over the personnel of a licensee, and authority to require from a licensee full statements of annual receipts and expenses. The Racing Commission, by statute, is authorized to permit a licensee to deduct improvements to plant as recurring expenses, and to accumulate reasonable annual depreciation on buildings and equipment for the retirement of funded debt and preferred stock.
The Commission, by statute, is further authorized to allow a licensee out of net revenue a sum not in excess of 4% of its "capital investment" as return on such investment. It is further required that all of the net revenue in excess of the 4% return on investment be set aside by the licensee for the retirement of debt and preferred stock, and for the maintenance of plant and purses, stakes and awards.
Pursuant to 28 Del.C., §§ 301-366, the Racing Commission licensed Steeplechase and ultimately its successor, Racing. These have been the only licensees of the Commission to date. The Racing Commission since its inception has consistently followed the legislative purpose exhibited by the statute of protecting and increasing the State's revenue from racing, and of curtailing the profits available to a licensee for distribution as dividends. It has exercised its statutory powers fully to that end and, presumably, will continue to do so for the future.
Thus it was that the Racing Commission, relying upon an opinion of the Attorney General dated June 20, 1936, interpreted 28 Del.C., § 329(c) allowing dividends not to exceed 4% of "capital investment" as referring only to "capital paid in * * * in return for stock."
Steeplechase was organized and licensed and by 1938 had invested approximately $1,170,000 in fixed assets, of which only $15,190.00 was supplied by the paid-in value of 1519 issued shares of $10 par common stock. The balance of the money invested by Steeplechase came from an issue of debentures and an issue of preferred stock. By 1945 the entire debenture issue had been redeemed, and by 1953 all of the preferred stock had been retired out of earnings, leaving as the sole corporate security outstanding 1519 shares of common stock. Meanwhile, from 1938 to July 31, 1963, the original investment of $1,170,000 in fixed assets had increased to $8,741,000.00. This increase had been financed out of earnings.
Since the inception of the racing enterprise, Steeplechase has paid no dividends on its common stock. It paid stated dividends on its preferred stock, retired since 1953. No dividends have been paid on the common stock by reason of the described statutory restrictions, restrictions imposed by the Racing Commission, limitations prescribed in loan agreements for the expansion of Steeplechase's facilities, and, finally, by reason of the policy of the promoters and managers to plow back all earnings for the constant betterment of racing facilities and the improvement of thoroughbred racing. *207 This management policy has long been known to the public.
In April, 1962, William duPont, a director and large stockholder of Steeplechase, made an offer to all of Steeplechase's common stockholders to join with him in giving their shares to Delaware Park, Inc., a charitable corporation and sole owner of Racing, or, in the alternative, to sell their shares to him at a price of $1,530 per share, in which event he undertook to give such shares to Delaware Park, Inc. His offer was based upon an appraisal of Steeplechase stock made by Standard Research Consultants which fixed the fair market value of Steeplechase common stock as of December 31, 1962 at $1,530 per share. A summary of the appraisal report accompanied Mr. duPont's offer.
As a result of this offer a total of 1390 shares of Steeplechase was acquired by Delaware Park, Inc., either as a gift from Mr. duPont or as gifts from other registered shareholders of Steeplechase.
Delaware Park, Inc., thereupon, as the owner in excess of 90% of the shares of Steeplechase, caused Steeplechase to be merged into Racing pursuant to 8 Del.C., § 253, the short-form merger statute.
Three questions are presented in this appeal:
1. Does the scope of review by this Court permit it to make its own findings and conclusions of fact contrary to the findings and conclusions made by the Vice Chancellor?
2. Is the intrinsic value of a dissenting stockholder's stock in an appraisal proceeding resulting from a merger under 8 Del.C., § 253, the liquidating rather than the going concern value of such shares?
3. Did the Vice Chancellor and the Appraiser err in their findings as to (a) asset value, (b) market value, (c) earnings value, (d) dividend value, and (e) the weight to be given each of these elements of value in appraising the Steeplechase stock?

Scope of Review
Relying upon Nardo v. Nardo, 209 A.2d 905, the stockholders argue that every appeal to this Court from Chancery is in effect a rehearing on both law and fact, and that it is the duty of this Court to review all the evidence and draw its own factual conclusions from the evidence independently of the findings of the trial judge. Reliance is made upon the Nardo opinion as the text appears in the Atlantic Reporter Advance Sheet for June 12, 1965, No. 5. Following the appearance of this advance sheet, in another appeal, it became apparent to us that the text of the Nardo opinion perhaps needed clarification for the reason that there had been no intention on our part to change the rule heretofore followed by this Court concerning the scope of its review of Chancery proceedings. We were of the opinion that certain language in Nardo v. Nardo was perhaps an overstatement. This clarification will appear in the permanent Volume 209 A.2d.
In substance, the rule as to scope of review is as it has always been, that it is our duty to review the evidence to test the propriety of the findings below. When the evidence consists primarily of depositions, documents, or the report of a master or appraiser, we may make our own conclusions, if the requirement of doing justice requires it and if the findings below are clearly wrong. Furthermore, when we are concerned with findings arising from deductions, processes of reasoning, or logical inferences, it is our duty to review them and, if the requirement of doing justice requires it and if the findings below are clearly wrong, then to draw our own inferences and reach our own conclusions. This is not to say, however, that we may ignore the findings below. On the contrary, when they are supported by the record and are the product of an orderly and logical deductive process, we, in the exercise of judicial restraint, accept them, even though independently we might have reached opposite conclusions. This, we think, is the *208 rule this Court has followed in the past, and it is the rule it will continue to follow for the future. See Sohland v. Baker, 15 Del.Ch. 431, 141 A. 277, 58 A.L.R. 693; New York Trust Co. v. Riley, 24 Del.Ch. 354, 16 A.2d 772; Blish v. Thompson Automatic Arms Corp., 30 Del.Ch. 538, 64 A. 2d 581.
Certain it is that in every appeal we do not approach its decision as though we were trial judges facing the duty of determining facts initially. We search the record solely for the ultimate purpose of determining whether or not error in fact or law was committed below.

Measure of Value
The stockholders argue that in an appraisal proceeding as a result of a short-form merger under 8 Del.C., § 253, the value of minority stock is its liquidating rather than going concern value, as is the case with long-form mergers under 8 Del. C., § 251.
The main thrust of the stockholders' argument for a different measure of value under § 253 from that under § 251 is that in mergers under § 251 a stockholder is free to continue in the going concern resulting from the merger or, in the alternative, is free to elect to withdraw from that enterprise and receive the value of his shares in cash. If he elects the latter, then it is proper, say the stockholders, to give him the going concern value of his stock, since he, himself, has chosen to withdraw from a going concern.
It is argued, however, that the same is not true with respect to short-form mergers under § 253 since the stockholder is given no election to continue his investment in the enterprise resulting from the merger, but is forced out and paid off in cash. Such being the case, it is said, he is entitled to be reimbursed for what has been taken from him, i. e., his aliquot interest in the assets of the corporation  in other words, the liquidating value of his shares.
We think, however, that there is no difference in the measure of value in appraisal proceedings growing out of a short-form merger under § 253 from the measure of value in appraisal proceedings growing out of a long-form merger under § 251.
In the first place, § 253(e) specifically provides that in the event a stockholder and the corporation fail to agree as to the value of the stock, either may petition for an appraisal as provided in 8 Del.C., § 262(c), and that, thereafter, § 262(d) to (j) shall govern the rights and duties of the parties. Section 262 long preceded the enactment of § 253. It theretofore had applied only to long-form mergers and consolidations. A substantial line of decisions followed the enactment of § 262 to the effect that the dissenting stockholder was entitled to receive the value of his stock on a going concern basis. It must be presumed that the General Assembly in incorporating § 262 into § 253 did so with knowledge of the construction that had been placed upon § 262 by the Courts. Koeppel v. E. I. duPont de Nemours & Co., 8 W.W.Harr. 542, 194 A. 847; Crawford, Statutory Construction, § 224. We are of the opinion, therefore, that the General Assembly must have intended that the measure of value to be applied in appraisals under § 262 in short-form mergers under § 253 should be the same as the measure of value long applied in appraisals under § 262 with respect to long-form mergers under § 251.
The argument of the stockholders that the fact that they are being forced out of a going concern and being paid off in cash should lead to a measure of value which would give them that which they would have received in the event of dissolution, while perhaps superficially appealing, is more properly addressed to the General Assembly which enacted the law as we have found it.
Furthermore, we note that § 253 does not require, in all short-form mergers, that minority stockholders be forced out of the resulting corporation, for § 253(a) *209 requires the parent corporation to state the terms and conditions of the merger "including the securities, cash or other consideration to be issued * * * upon surrender of each share of the subsidiary corporation * * * not owned by the parent corporation." Thus, conceivably, the parent corporation could if it wished permit the minority to remain in the resultant going enterprise. The fact that § 253 is designed to give the parent corporation, as we said in Stauffer v. Standard Brands, Del., 187 A.2d 78, "a means of eliminating the minority stockholders' interest in the enterprise" does not alter the result. The parent corporation at its election may adopt either method.
Since, therefore, the measure of value under § 253 is the same as the measure of value under § 251, it follows that these stockholders are entitled to be paid the intrinsic value of their shares determined on a going concern basis, which excludes a valuation based solely upon the liquidating value, or an aliquot share in the value of the assets of the merged corporation. Tri-Continental Corp. v. Battye, 31 Del.Ch. 523, 74 A.2d 71.

Asset Value
Both the Appraiser and the Vice Chancellor made findings as to the value of the assets of Steeplechase. The stockholders accept these findings but object to the deduction from the total asset value of 27% for obsolescence, to the refusal to include in the asset valuation a figure representing construction in progress and leasehold improvements, and to the deduction of a figure representing demolition costs from the value of the land.

Obsolescence
Delaware Park, the racing plant of Steeplechase, was built in 1937 when most of the patrons of the track arrived by railroad. At this time Delaware Park was favorably situated in close proximity to the tracks of the Pennsylvania and B. & O. Railroads. The establishment was laid out to take advantage of this then fortunate situation.
However, following the War, the pattern of transportation changed. Most, if not the greatly larger number of patrons now come to the track by automobile. The change in patron transportation habits was unfortunate from the point of view of Delaware Park. It now finds itself hemmed in by the railroad tracks which formerly served it so well.
Of primary concern are traffic and parking problems occasioned by the fact that the main entrance to the track for vehicular traffic is now an entrance across the racing oval from the grandstand and clubhouse. This causes traffic flow inside the park where none or little had been encountered before. In addition, the close proximity of the tracks to the rear of the grandstand has prevented the expansion of it to give more required space to accommodate the wagering public and for pari-mutuel ticket and money-handling problems. In addition, the change in traffic patterns has created problems in the supplying of facilities for animals and employees at the track.
The Appraiser found these items to be incurable functional and economic obsolescence, and concluded that a deduction for such obsolescence should be made. He concluded to apply the "age-life" method in order to determine what this deduction should be. This is one of the methods generally accepted for such purpose. The Appraisal of Real Estate, 212-213, 217-219.
The Appraiser's rationale in determining the percentage factor to be applied to determine obsolescence was that the racing facility had a life expectancy of 331/3 years which meant an age-life rate of 3% per year. He concluded that 1% of this was attributable to combined functional and economic obsolescence. Since the plant had been in existence for 27 years, he applied a 27% rate to the entire installation as an operational whole. This finding was approved by the Vice Chancellor.
*210 The stockholders do not argue that no deduction should be made for obsolescence. They say, however, that the rate applied was far too high; that the rate should have been perhaps not more than 2%, and that in any event it should not have been applied in addition to depreciation to "equipment and personal property" and to the "newly refurbished clubhouse." They say that obsolescence is applicable only to the clubhouse and grandstand, and perhaps to the former main parking lot on Kirkwood Highway, not used at present to its former extent by reason of the change in transportation patterns.
We think, however, the stockholders misconceive what it was the Appraiser and the Vice Chancellor did. They concluded, and properly so we think upon this record, that the functional layout of Delaware Park was obsolete to a substantial degree because of the changes in the habits of the betting public, and because of the physical inability to adapt existing facilities to serve the public more efficiently.
This being so, they applied the obsolescence rate to the value of the plant as a whole, not to individual items as the stockholders would have them do. In so doing, we think they were correct for the test of the modernity of any facility to serve the public is its ability to do the job. If, by reason of the passage of time and the change of public habits, a racing plant, originally well designed for the purpose, has become less efficient to serve the purpose for which it is used, it has to some extent at least become obsolete as a whole  not merely the separate installations which together go to make up the whole plant.
We therefore affirm the ruling of the Appraiser and the Vice Chancellor that an obsolescence rate must be applied to the depreciated value of Steeplechase's racing plant as a whole. What that rate should be is a matter of judgment. The rate of 27% was determined in accordance with accepted theories and, in the judgment of both the Appraiser and Vice Chancellor, was proper. Since it is apparent that it was not arbitrarily determined, we will not disturb it.
We affirm the application of an obsolescence rate of 27% to the asset value of Steeplechase.

Construction in Progress and Leasehold Improvements
The stockholders object to the refusal of the Appraiser and the Vice Chancellor to include specifically in the assets of Steeplechase the sum of $192,607.00 which, apparently, was money paid for steel for future construction and for architects' fees. The difficulty with the argument made with respect to this is that at the hearing before him the Appraiser invited the stockholders to produce proof that the items in question were not included by the Appraiser in Current Assets as Deferred Charges. No such proof was offered and we think, therefore, the argument falls.

Deduction of Demolition Cost
The real estate appraiser for Steeplechase testified that the best possible use for its land was for residential purposes. The stockholders on the other hand produced witnesses who testified that probably the land would be used for industrial purposes and put a much higher value upon it. However, the Appraiser and the Vice Chancellor accepted the valuation of $2,754,000.00 based upon residential use as the more justified. The stockholders in this appeal do not take exception to this valuation.
They do, however, argue that it was improper to deduct from that valuation the sum of $457,000.00 representing the cost of demolition of existing structures in order to make the land available for residential use. They do not object to the amount estimated for demolition cost, but do object to any deduction at all for that purpose.
We think the stockholders are wrong. The land in question is being used, not for residential purposes, but for a racing *211 plant. Since residential use is conceded to be the best possible use, presumably the land would be more valuable for that purpose than for any other. Accordingly, a different use would necessarily discount the value of the land. Furthermore, it seems quite obvious to us that if the land were to be sold for residential use the purchaser in fixing the amount he was willing to pay would take into consideration the cost of demolishing existing structures in order to devote the land to the use intended.
It should be remembered, furthermore, that the value of the land to Steeplechase is its value as the location of a racing plant. Since we are concerned with a going concern value, we think the land value should reflect its value with respect to that going concern, and not with respect to a theoretical use. We accordingly affirm the deduction from land value of the cost of demolition of existing structures.

Market Value
The stockholders object to the Appraiser's finding, based upon the duPont offer to Steeplechase stockholders, of a market value of $1,530.00. They also object to the Vice Chancellor's use of the figure of $1,305.00 on the basis of a subsequent appraisal some year and a half after the fixing of the higher figure but reflecting the 1962 and 1963 earnings of Steeplechase. The stockholders take the position that there was no established market for Steeplechase shares and that the trading in the stock was so thin that none could be constructed.
It is, of course, axiomatic that if there is an established market for shares of a corporation the market value of such shares must be taken into consideration in an appraisal of their intrinsic value. Chicago Corporation v. Munds, 20 Del.Ch. 142, 172 A. 452. And if there is no reliable established market value for the shares a reconstructed market value, if one can be made, must be given consideration. Tri-Continental Corp. v. Battye, supra. It is, of course, equally axiomatic that market value, either actual or constructed, is not the sole element to be taken into consideration in the appraisal of stock.
The argument of the stockholders, we think, does not dispute this. They argue that market value is not an element to be considered in this appraisal because no reliable market existed, and none could be constructed.
The Appraiser found a market in the duPont offer to purchase Steeplechase shares at $1,530 and gave effect to this value in his ultimate appraisal. The stockholders attack this finding, citing in support Sporborg v. City Specialty Stores, 35 Del.Ch. 560, 123 A.2d 121. That case, however, is not apposite. It dealt with a situation in which a controlling stockholder for a period of almost two years prior to the merger had maintained a market in the stock. The use of a value based upon such an artificially maintained market was rejected because it was a market made only by one party in interest and which, consequently, was maintained at an artificially high level.
This is not the fact with respect to the duPont offer. He was not the controlling stockholder of Steeplechase. His offer was made, not on the basis of a so-called market figure, but was based on the true value of the stock as determined by a very exhaustive appraisal made by an independent appraiser. Under the circumstances, we think, a market value was established by the sale or gift of over 93% of Steeplechase stock over less than two years at a value of $1,530. Consequently, it was not error for the Appraiser to conclude that there was a market value at this amount.
The Vice Chancellor, however, did not accept this finding of the Appraiser. He preferred to adopt a "reconstructed market value" of $1,305 per share as of the date of the merger. The reconstructed market value as of the date of merger was made by the same appraisers who had, in February, *212 1962, fixed the market value of Steeplechase stock at $1,530 per share. The reason for the reduction in amount is that by the date of the merger the 1962 and 1963 earnings of Steeplechase were known. These earnings had declined and this fact led to a reduction in the figure representing market value.
We think it was proper for the Vice Chancellor to accept this reconstructed market value related precisely to the date of merger. Since value, particularly market value, is dependent to a large extent on earnings, it is proper to take into consideration a reduction in those earnings in constructing a market value. If this is a matter entering into the realm of judgment, as we think it probably is, we can find nothing in this record to indicate an erroneous exercise of judgment by the Vice Chancellor. We therefore affirm his finding as to market value.

Earnings Value
Using an average of the five-year period 1958-1962, the Appraiser fixed the earnings per share of Steeplechase stock at $182.13. The Vice Chancellor rejected this finding and using the five-year period 1959-1963 fixed the earnings per share of Steeplechase stock at $120.19. The Appraiser in order to capitalize these earnings used a multiplier of 15.2, while the Vice Chancellor used a multiplier of 10. The stockholders except to the findings with respect to earnings value of both the Appraiser and the Vice Chancellor.
The main contention of the stockholders in this respect is a complaint against the use by Steeplechase of the sum-of-the-years digit method of depreciation which permitted Steeplechase to depreciate the major part of the cost of assets over the early years of their existence, thus reducing annual net income by a substantial amount. Accordingly, the stockholders' accountant divided Steeplechase's assets into those acquired prior to January 1, 1959 and those acquired or improved subsequent to that date. Depreciation on each of these assets was then recomputed on a basis which the accountant felt to be more proper. In so doing, the accountant materially increased the annual net earnings of Steeplechase.
Delaware law requires that earnings value be determined on the basis of historical earnings rather than on the basis of prospective earnings. Cottrell v. Pawcatuck Company, 36 Del.Ch. 169, 128 A.2d 225. Average earnings over the five-year period immediately preceding the merger have ordinarily been used as the basis for determining earnings value.
We therefore are of the opinion that the Vice Chancellor was correct in averaging earnings over the five years 1959-1963, since that was the period immediately preceding the merger. Even though the merger took place on July 31, 1963, the annual race meeting of that year had terminated by that time and all of Steeplechase's 1963 earnings had been made.
Furthermore, to start the period to be averaged with the year 1958 was to give a distorted effect to Steeplechase's earnings for the reason that 1958 was the first year of the so-called "long meeting," about 50 days, whereas theretofore meetings had been limited to 30 days. By reason of this, the earnings for 1958 were greatly increased. Furthermore, the new clubhouse had not been completed in 1958, although it was in progress, and there was no charge against 1958 earnings for this expense. All in all, we think it was more proper to take the five years 1959-1963 as the period to determine average earnings.
The argument of the stockholders based on the recalculation of depreciation by their accountant in reality comes down to nothing more than a disagreement among accountants as to what method should be followed in the depreciation of assets. The method of depreciation followed by Steeplechase was admittedly an acceptable accounting method and was accepted and approved *213 by the Racing Commission and the Internal Revenue Service. This being so, we think the Appraiser and the Vice Chancellor did not err in accepting the method also.
Finally, the stockholders object to the use by the Vice Chancellor of a multiplier of 10 to fix the capitalized value of earnings. They argue that the multiplier of 15.2, that used by the Appraiser, should be applied. They point to the fact that Steeplechase is not an industrial-type business, not a retail store, nor a closed-end investment company. They liken it to a public utility as to which a proper multiplier is 15.2.
We think, however, that there are strong reasons why Steeplechase is not comparable to a public utility. In the first place, it is not a monopoly. It, in fact, operates in a field in which there is strong competition from other nearby tracks in neighboring states. In the second place, the State does not guarantee Steeplechase a fair return on its investment as it does with respect to public utilities. We think the two are not comparable. In fact, we believe Steeplechase to be unique.
In any event, the application of a multiplier to average earnings in order to capitalize them lies within the realm of judgment. There is no hard and fast rule to govern the selection. The multiplier of 10 used by the Vice Chancellor finds support in Dewing, The Financial Policies of Corporations (5th Ed.) 338-40, a book relied on in the past by the courts of this State. We cannot say, therefore, that reliance on this authority by the Vice Chancellor was improper. We affirm his use of a multiplier of 10.

Dividend Value
Both the Appraiser and the Vice Chancellor found that the dividend value of Steeplechase was zero and gave it 10% weight. The stockholders object to this and argue that dividend value should be given no independent weight whatsoever independent of earnings. Their reason for this is that earnings and dividends are so clearly related that they largely reflect the same value factor.
In Tri-Continental Corp. v. Battye, supra, we pointed out that the object of an appraisal was to give the dissenting stockholder the equivalent of that which he could expect to receive in one way or another if he had remained as a stockholder in the going concern. This means, of course, that dividends paid, or the possibility of them being paid in the future, is of especial significance in questions of valuation since receipt of dividends is ordinarily the most usual way for the stockholder to realize upon the value of his stock.
In the case of Steeplechase, no dividends have ever been paid on the common stock, and at the time of the merger it did not appear that the prospect of payment in the future was any brighter. This stemmed from the admittedly no-profit policy of the management, the restrictions imposed by the Racing Commission upon the payment of dividends on the common stock, and the plain fact that earnings in any substantial amount would not be available for the payment of dividends in the foreseeable future.
By reason of these facts, both the Appraiser and the Vice Chancellor gave the non-payment of dividends "substantial negative recognition." This conclusion is in accord with Adams v. R. C. Williams & Co., Del.Ch., 158 A.2d 797, in which the Chancellor referred back an appraisal proceeding to the Appraiser with instructions to give some weight to a negative dividend factor. On further hearing the Appraiser gave 40% weight to the zero earnings value, which was later affirmed by the Chancellor in an unreported opinion.
Since a negative dividend value clearly is pertinent in fixing the value of stock, we cannot say that the judgment of the Appraiser and the Vice Chancellor was in error in giving it a negative weighting. We affirm that decision.

*214 Weighting

The Vice Chancellor reversed the weighting given by the Appraiser to the various elements of value and weighted those elements according to his own judgment. His weighting was as follows:

 Asset Value 25%
 Market Value 40%
 Earnings Value 25%
 Dividend Value 10%

In so doing the Vice Chancellor disagreed with the Appraiser who had weighted asset value at 40% and market value at 25%. The Vice Chancellor reduced the weight to be given asset value for the reason that there were no plans to liquidate the Steeplechase assets and, therefore, the assets would continue to be held for the purpose of future earnings.
Since the value of Steeplechase shares is not to be determined on the basis of a liquidation, we cannot say as a matter of law that the Vice Chancellor's judgment on this was clearly wrong.
The Vice Chancellor weighted market value at 40% because of his judgment that in the long run the most likely way in which an investor in Steeplechase stock, if permitted to continue in the resulting enterprise, could have realized on his investment was by way of a sale of his shares. This conclusion accords with the Tri-Continental case and, we think, is a proper reason for changing the weighting given this element by the Appraiser.
The question of what weight to give the various elements of value lies always within the realm of judgment. There is no precise criterion to apply to determine the question. It is a matter of discretion with the valuator. In the absence of a clear indication of a mistake of judgment, or a mistake of law, we think this Court should accept the reasoned exercise of judgment of the Vice Chancellor and not substitute its own guess as to what the proper weightings should be. Since there has been no showing of an improper or arbitrary exercise of judgment by the Vice Chancellor, we accept his findings in this respect.
By reason of the foregoing, the judgment of the Vice Chancellor fixing the value of the stockholders' stock in Steeplechase at $2,321.30 per share is affirmed.