Helen M. BROWN and John Quanrud,
Plaintiffs and Respondents,

v.

HEDAHL'S–Q B & R, INC., a corporation,
Defendants and Appellants.

Civ. No. 8595.

Supreme Court of North Dakota.

Feb. 16, 1971.

Rehearing Denied April 12, 1971.

judgment of the district court establishing the value of certain stock in a closely held corporation at $230 per share. The case arose under Section 10–20–08, N.D.C.C., when John Quanrud, on his own behalf and acting through a power ¡of attorney on behalf of his sister, Helen Quanrud Brown, dissented from a merger of Quanrud, Brink & Reibold, Incorporated (hereinafter referred to as Q B & R), of which they were shareholders, and Hedahl's, Incorporated (hereinafter referred to as Hedahl's, Inc.).

Both Q B & R and Hedahl's, Inc., were North Dakota corporations engaged as competitors in the wholesale auto parts business. Q B & R was incorporated in 1922 from a motor car supply company that had been started by Mr. Quanrud's father in 1917. This business apparently prospered over the years as Q B & R, just prior to the merger with Hedahl's, Inc., had stores in Bismarck, Jamestown, Dickinson, and subsidiaries of Q B & R in Montana at Glendive and Sidney. In the last several years, however, Q B & R suffered a series of losses which were due mainly to management. Hedahl's was incorporated in 1960 from a partnership that had been formed in 1945. Hedahl's apparently enjoyed capable management and was profitable. Hedahl's regarded Q B & R as their second major competitor. In the fall of 1967, Mr. Al Brink, who was chairman of the board of Q B & R, approached Hedahl's, Inc., and offered to sell his 810 shares of Q B & R stock at a price of $100 per share. There was a total of 2,922 shares of Q B & R stock outstanding. Hedahl's, Inc., took an option from Mr. Brink, good for four months, by which it would purchase his stock if it could secure enough options from other Q B & R shareholders to assure control of the corporation. Having obtained options on a sufficient number of shares, Hedahl's, Inc., exercised them on December 6, 1967, and obtained over 51% of the outstanding Q B & R stock. Subsequently, on December 18, 1967, a meeting of the Q B & R shareholders was held

---

Zuger, Bucklin, Kelsch & Zuger, Bismarck, for defendants and appellants.

Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, for plaintiffs and respondents.

TEIGEN, Chief Justice.

This case comes to us on appeal with a demand for a trial de novo from the

wherein Erling Hedahl, Neil Hedahl, and Beulah Hedahl were elected as directors of the corporation. On February 17, 1968, the directors of Q B & R met and approved a plan for merger with Hedahl's, Inc., and called a special meeting of the shareholders for the purpose of considering the merger proposal. On March 9 the special meeting of the shareholders of Q B & R was held during which the merger with Hedahl's, Inc., was approved. At that time Mr. Quanrud appeared and dissented on his own behalf, as proxy for Mrs. Bjornstad, and on behalf of his sister. Subsequent negotiations were conducted between John Quanrud and Hedahl's-Q B & R, Inc., (the surviving corporation) to determine the "fair value of his shares as of the day prior to the date on which the vote was taken approving the merger", as provided in Section 10–20–08, N.D.C.C. However, no agreement was reached as John Quanrud was asking $322 per share while Hedahl's-Q B & R, Inc., was willing to pay only $100 per share. Accordingly, this action was brought in the district court asking for a "finding and determination of the fair value of such shares" as provided in Section 10–20–08, N.D.C.C.

In this appeal from the decision of the trial court, two issues are raised. The primary issue goes to a determination of the "fair value" of the shares of Q B & R stock of the dissenting shareholders. This court is called upon to find the facts anew and establish just what is the "fair value" of the stock in question.

A collateral issue is raised as to 112½ of the 183¾ shares claimed by the plaintiff in this action, John Quanrud, to be owned by him. It is the contention of the defendant that John Quanrud was a purchaser of these shares with knowledge of an impending merger and, therefore, is not a bona fide shareholder within the meaning of Section 10–20–08, N.D.C.C., which is the statute under which this action is brought. Section 10–20–08, N.D.C.C., in part, provides:

"If a shareholder of a corporation which is a party to a merger or consolidation shall file with such corporation, prior to or at the meeting of shareholders at which the plan of merger or consolidation is submitted to a vote, a written objection to such plan of merger or consolidation, and shall not vote in favor thereof, and such shareholder, within ten days after the date on which the vote was taken, shall make written demand on the surviving or new corporation, domestic or foreign, for payment of the fair value of his shares as of the day prior to the date on which the vote was taken approving the merger or consolidation, * * * if the merger or consolidation is effected, the surviving or new corporation shall pay to such shareholder, upon surrender of his certificate or certificates representing such shares, the fair value thereof."

The 112½ shares were owned by Mrs. Olina Bjornstad. According to the evidence, John Quanrud made an offer to purchase these shares from Mrs. Bjornstad in the fall of 1965. This offer was renewed on at least two occasions subsequent to that date. Sometime prior to December 30, 1967, Mrs. Bjornstad apparently accepted John Quanrud's offer as it appears that, on December 30, 1967, he paid her for them at the rate of $100 per share. Payment was made partly in cash and the balance by delivery of his promissory note. Mrs. Bjornstad at that time was in the state of Indiana and did not transfer the shares by endorsement and delivery of the certificates until she returned to North Dakota. The transfer is dated February 29, 1968. On March 4, 1968, John Quanrud delivered the endorsed certificates representing the stock in question to the corporation with the request for a transfer of the shares to his name. However, the shares were not transferred on the books of the corporation but the certificates were retained by it and John Quanrud was given a receipt for the shares. It appears that this was appropriate practice on the part of the corpora-

tion under Section 10-19-30, N.D.C.C., because the directors of the corporation had called a special meeting of the shareholders for the purpose of considering the proposed merger and had mailed notices thereof to the shareholders on February 17, 1968. The record before us does not establish whether the board of directors had closed the stock transfer books for any fixed period for the purpose of determining the shareholders entitled to notice or to vote at the special meeting of the shareholders but, under Section 10-19-30, N.D.C.C., the stock transfer books were statutorily closed for such purpose on February 17, 1968, the date on which the notice of the meeting was mailed. Therefore, a transfer of these shares to John Quanrud could not be effected after February 17, 1968, and he could not vote these shares as a shareholder at the special meeting of shareholders called for March 9, 1968. It was, therefore, necessary that these shares be voted at the special meeting of March 9, 1968, by Mrs. Bjornstad or her proxy. Section 10-19-33, N.D.C.C. Mrs. Bjornstad gave her proxy on January 20, 1968, to John Quanrud. Pursuant to his authority under the proxy he filed a written objection to the plan of merger on March 9, 1968, receipt of which is acknowledged by the secretary of the corporation, and, as proxy, he voted the shares at the special meeting of the shareholders. The shares were not voted in favor of the plan of merger. Following the close of the shareholders' meeting held on March 9, 1968, and within ten days after the date on which the vote on the plan for merger was taken, John Quanrud, as a shareholder and owner of these shares, filed with the corporation a demand for the payment of the fair value of the shares pursuant to Section 10-20-08, N.D.C.C. The transfer books of the corporation were again opened for transfer of shares following the close of the special meeting on March 9. The Bjornstad certificate carrying Mrs. Bjornstad's endorsement for transfer of these shares to John Quanrud had been on file with the secretary of the corporation since

March 4, 1968, and, although the record before us does not state, we must assume, under the circumstances, that the appropriate officer of the corporation had performed his duty and transferred the shares on the books of the corporation following the close of the special meeting when the ban on stock transfers on the corporation books had expired and, at the time of the commencement of this action on May 22, 1968, pursuant to authority under Section 10-20-08, N.D.C.C., John Quanrud was a shareholder as defined in Section 10-19-02(6), N.D.C.C. It states:

" 'Shareholder' means one who is a holder of record of shares in a corporation;"

Thus it is clear that the 112½ shares are qualified for the benefits provided under Section 10-20-08, N.D.C.C., and that these rights were protected by Mrs. Bjornstad when her proxy filed a written objection to the plan of merger and did not vote in favor thereof. John Quanrud was entitled to a transfer of these shares upon the corporation books following the close of the date on which the vote was taken, to wit, March 9, 1968, and he succeeded Mrs. Bjornstad not only as a shareholder of record on the corporate books but also to all of the rights which the shares carried. He became substituted for his vendor, Mrs. Bjornstad, and thereafter holds such shares under the same conditions and subject to the same obligations as his vendor held prior to the transfer. 18 Am.Jur. 2d Corporations, Sec. 398.

As to the issue of the valuation of the shares, this case is one of first impression. Our statute under which this question arises, Section 10-20-08, N.D.C.C., simply provides that shareholders dissenting to a merger have the right to demand payment of the "fair value" of their shares and that, failing agreement between the shareholders and the corporation, an action can be brought in any court of competent jurisdiction asking for a finding and determination of the "fair value" of such shares.

It appears, as a matter of general law, that there are three primary methods used by courts in determining the fair value of shares of dissenting shareholders. These three methods are the market value method, the asset value method, and the investment or earnings value method. The market value method establishes the value of the share on the basis of the price for which a share is selling or could be sold to a willing buyer. This method is most reliable where there is an established market for the stock. The asset value method looks to the net assets of the corporation valued as a "going concern", each share having a pro rata value of the net assets. The net assets value depends on the real worth of the assets as determined by physical appraisals, accurate inventories, and realistic allowances for depreciation and obsolescence. The investment value method relates to the earning capacity of the corporation and involves an attempt to predict its future income based primarily on its previous earnings record. Dividends paid by the corporation are considered in its investment value. Generally, all the elements involved in these methods are considered in determining the value of the dissenter's stock. 19 Am.Jur.2d Corporations, Sec. 518, Anno., 38 A.L.R.2d 442; N., Valuation of Dissenter's Stock, 79 Harv.L.Rev. 1453 (1966); N., Elements in Valuation of Corporate Stock, 55 Mich.L.Rev. 689 (1957).

In the present case the district court determined that the "fair value" of the plaintiff's shares of common stock in Q B & R as of March 8, 1968, was $230 a share. The district court arrived at this figure by "giving full weight to all the factors as required by law," although there is no indication as to what weight it gave each of the various factors involved in determining the fair value of the Q B & R stock. As this case is here for a trial de novo, we are required to examine all of the facts and redetermine the "fair value" of the dissenter's shares of Q B & R stock as of March 8, 1968. Section 28–27–32, N.D.C.C.

The bulk of the testimony and exhibits admitted in this case relate to the asset value method of valuation, although there is testimony relating to the market value and the investment or earnings value methods of valuation. John Quanrud and an expert witness, Mr. Charles Bailly, testified on behalf of the plaintiff as to what the fair value of the shares was as of March 8, 1968. Mr. Quanrud was the first witness called by the plaintiff. He testified that he did not take into account the market for the Q B & R stock and the value of the earnings of Q B & R. His estimate of the value of Q B & R stock was based solely on the value of the assets of Q B & R. He admitted that in determining the value of the assets of Q B & R he did not take into account certain commonly recognized factors in valuing corporate assets. In his estimate of the Q B & R assets he made no allowance for the uncollectibility of accounts receivable nor did he make any allowance for obsolescence in inventories. In addition, Mr. Quanrud's estimate of the value of Q B & R assets included his own appraisal of certain real estate and buildings which was $113,200 in excess of the amount established by a professional appraiser and stipulated to by the defendant. Mr. Quanrud also included a figure of $50,000 for goodwill in evaluating the assets of Q B & R. Given these considerations, he determined that the value per share of Q B & R stock was $322. This valuation is well in excess of that testified to by his own expert witness.

Mr. Bailly testified that the value of the shares of Q B & R stock was in excess of $249 per share. He stated that he considered all factors in arriving at this valuation, although he did not use the market value nor the investment value method of valuation. Mr. Bailly rejected the market value method due to the fact that Q B & R was a closely held corporation. He considered any market for stock in a closely held corporation to be artificial. He also stated that he considered earnings as a factor in the asset method of valuation in that he considered dividends, although he did not consider earnings or dividends as independent factors. Mr. Bailly found nothing in his analysis

of Q B & R to justify including any amount for goodwill. Although he stated that he considered all factors involved, it appears from the record that he simply consolidated the financial statements of the North Dakota Q B & R corporation and its Montana subsidiary corporation and made certain adjustments to the values reflected in the assets listed on these two statements. These two statements were prepared as of December 31, 1967, and were received in evidence. A consolidated balance sheet for Q B & R as of December 31, 1967, was never admitted in evidence although Mr. Bailly stated that in arriving at his figures he consolidated these two statements. The adjustments he made to these statements related to the book value for the real estate and buildings held by the North Dakota corporation and the Montana corporation. These adjustments were based on appraisals made by an appraisal agency which were received in evidence and stipulated and agreed to by the defendant. These appraisals fixed the value of the North Dakota real estate and buildings at $127,-000 versus the book value of approximately $35,000, and fixed the value of the Montana real estate and buildings at $80,300 versus the book value of approximately $56,200. After adding the difference between the appraisal value and the book value to the consolidated asset statement, Mr. Bailly arrived at a gross asset figure which, less the liabilities, resulted in a net asset value of $728,123. That figure was then divided by the 2,922 shares of Q B & R stock outstanding to arrive at a valuation per share in excess of $249.

Mr. Erling Hedahl, the president of Hedahl's-Q B & R, Inc., was the primary witness testifying on behalf of the defendant. He stated that he considered the fair value of a share of Q B & R stock to be $100, and that in arriving at this figure he had considered all three methods of valuation. As to the assets of Q B & R, Mr. Hedahl testified using a consolidated balance sheet for both the Q B & R corporations in North Dakota and Montana as of February 29, 1968, which had been received

in evidence. He testified as to several adjustments that should be made in this statement to properly reflect the true value of the Q B & R assets. The first adjustment was to show the Q B & R real estate and buildings at a true value of $207,300 as per the stipulation that had been entered into by the parties. This same adjustment was made by Mr. Bailly in his testimony. Mr. Hedahl testified that from his experience accounts receivable were never collected one hundred cents on the dollar, and that a reasonable allowance for uncollectibility would be 10%. Mr. Hedahl also testified that in the automotive parts business it was necessary to allow for an obsolescence factor in inventory of 15%. Mr. Hedahl noted that the book value of certain furniture and fixtures was less than its true value, which he placed at $9,000. As to notes receivable listed on the February 29, 1968, consolidated statement at $6,641, Mr. Hedahl testified that the maker of the note had been deceased for many years although, while living, Q B & R took from him on the note a building which has a present worth of $3,000 or less. As to certain vehicles listed on the statement at a value of $14,224, Mr. Hedahl adjusted that figure downward to $11,385 to reflect their true value as established by figures in the National Automobile Dealers Manuals. Certain shop equipment was listed at a depreciated value of $13,451. Mr. Hedahl adjusted that figure upward to $20,250 to properly reflect its true value. As to certain stocks and bonds listed at $5,424, Mr. Hedahl adjusted that figure downward to $4,000 to account for certain Cuban bonds which are now worthless and to account for corporate stock in another company which has been out of existence for many years. From the foregoing adjustments, Mr. Hedahl testified that he believed that the asset value of the shares was in excess of $200 per share, although no exact calculation was introduced into evidence. Based on a plaintiffs' exhibit showing comparative net profits between Q B & R and Hedahl's, Inc., Mr. Hedahl testified that the earnings value of Q B & R is zero. Using a five-year aver-

age Q B & R showed a loss of 14¢ per share (disregarding 1967), while over a six-year period Q B & R showed a loss of $4.62 per share (including 1967). Therefore, instead of earnings, Q B & R actually had losses such that the earnings value of Q B & R was zero. Mr. Hedahl also testified that before Hedahl's, Inc., sought to buy control of Q B & R the market value of the Q B & R stock was between $50 and $67 per share, and that when Hedahl's, Inc., paid $100 per share for the Q B & R stock they were actually paying a premium of $33 per share.

In redetermining the "fair value" of a share of Q B & R stock as of March 8, 1968, we have used all three methods of valuation and have established a value under each method which we have assigned a certain percentage weight in determining the fair value of the Q B & R stock. In determining the asset value as of March 8, 1968, we have used the consolidated statement of February 29, 1968, as that is the closest statement to the date in question. We have made certain adjustments to this statement to more properly reflect the true value of the assets of Q B & R as a "going concern." The value of the Q B & R real estate and buildings ought to be set at the

value established by the independent appraiser and stipulated to by the parties at $207,300. A reasonable allowance for the uncollectibility of accounts receivable is 10%; therefore the statement figure of $184,800 ought to be reduced to $166,320. The notes receivable account in the Q B & R statement ought to be reduced from $6,641.27 to $3,000 to reflect the true worth of the note held by Q B & R from a deceased person who had assigned against this note a building that is worth $3,000, or less. The stocks and bonds account ought to be reduced from $5,423.98 to $4,000 to account for certain Cuban bonds which are now worthless and stock in a corporation that has not been in existence for a number of years. The book value of furniture and fixtures of $4,792.50 ought to be increased to $9,000 to more adequately reflect their true value and, likewise, the value of the shop equipment listed at $13,450.98 ought to be increased to $20,250. The value of Q B & R's cars and trucks, listed at $14,223.92, ought to be reduced to $11,385 to properly reflect their true value. The book value and the adjusted value of the Q B & R assets as of February 29, 1968, is shown below:

Q B & R CONSOLIDATED STATEMENT
February 29, 1968

| CURRENT ASSETS: | Book Value | Adjusted Value |
|---|---|---|
| Cash on hand and in banks | 10,583.75 | 10,583.75 |
| Notes Receivable | 6,641.27 | 3,000.00 |
| Accounts Receivable | 184,800.00 | 166,320.00 |
| Inventories | 469,932.77 | 469,932.77 |
| Stocks and Bonds | 5,423.98 | 4,000.00 |
| Cash Value Life Insurance | 10,860.00 | 10,860.00 |
| FIXED ASSETS: | | |
| Real Estate—Lots | 34,916.73 | 207,300.00 |
| Real Estate—Buildings | 56,150.99 | (Bldgs. included above) |
| Furniture & Fixtures | 4,792.50 | 9,000.00 |
| Shop Equipment | 13,450.98 | 20,250.00 |
| Autos & Trucks | 14,223.92 | 11,385.00 |
| TOTAL ASSETS: | 811,776.89 | 912,631.52 |
| TOTAL LIABILITIES: | 203,228.93 | 203,228.93 |
| NET ASSET VALUE: | 608,547.96 | 709,402.59 |

Total Shares Outstanding: 2,922

Asset Value Per Share based on the adjusted statement value of Q B & R:

$$\frac{242.81}{2,922/709,402.59}$$

The asset value per share, then, based on the adjusted value of the Q B & R assets as of February 29, 1968, is $242.81 per share.

■ Under the investment value (or earnings value) method of valuation, the value per share of Q B & R stock as of March 8, 1968, is zero. Q B & R had sustained a series of losses for several years prior to its merger with Hedahl's, Inc. Plaintiffs' exhibit showing the comparative net profits between Q B & R and Hedahl's, Inc., from 1962 through 1967 shows that Q B & R's five-year average net earnings per share, disregarding 1967, the year prior to the merger, was a loss of 14¢ per share. Based on a six-year average, which includes 1967, the earnings per share was a loss of $4.62 per share. Based on its earnings record, Q B & R was not a good investment and its earnings value is properly fixed at zero.

A limited market existed for Q B & R stock from June of 1963 until December 6, 1967, when Hedahl's, Inc., exercised its options to purchase Q B & R stock at $100 per share. In 1963, 31 shares changed hands at a price of $66.67. There were no sales in 1964 although 285 shares were placed in trust. In 1965, 70 shares traded hands at a price of $50 per share. In 1966, 15 shares were sold for $66.67. In February 1967, 45 shares were sold for $52.50, and 63 shares were sold for $50. In March 1967, 63 shares of Q B & R stock were sold for $50 per share. On April 17, 1967, Theodore S. Quanrud sold 141½ shares to the Dakota National Bank for $100 per share. The Dakota National Bank turned around and, on the very same day, sold these 141½ shares to R. E. Meidinger for $107.50. On July 12, 1967, Theodore S. Quanrud sold 19 shares to R. E. Meidinger for $105 per share. The next transaction in Q B & R stock occurred on December 6, 1967, when Hedahl's, Inc., exercised its options from various Q B & R shareholders at $100 per share.

■ It appears that there is no established market for the Q B & R shares and thus there is no apparent market value that can be assigned to a share of Q B & R stock. However, a reconstructed market value can be established based on the limited transactions that have occurred. In Application of Delaware Racing Association, 42 Del.Ch. 477, 213 A.2d 203 (S.Ct.1965), affirming 42 Del.Ch. 175, 206 A.2d 664 (Ch.1965), the court found that although there was no established market for the 1,519 shares of common stock outstanding, that nevertheless a reconstructed market value could be established. The reconstructed market value in this case was based on the report of an appraiser who made a thorough study of the corporation to determine its value per share. Based on this determination, one stockholder purchased 93% of the outstanding stock. However, the Delaware court found that it was proper for the court to reduce this reconstructed market value due to the fact that market value was in large part dependent upon earnings which had declined, thereby reducing the market value of the stock. In this present case we have a similar situation where one party seeks to buy a controlling interest in the corporation based on its own study of what the Q B & R stock was worth. The fact that Q B & R had no earnings supports Mr. Erling Hedahl's contention that Hedahl's, Inc., had actually purchased the controlling interest in Q B & R by paying a premium on each share that it purchased. An examination of the transactions that occurred in Q B & R stock from June of 1963 to December 6, 1967, indicates that a reconstructed market value can be established. Vought v. Republic-Franklin Insurance Co., 117 Ohio App. 389, 192 N.E.2d 332 (1962). From June of 1963 through March of 1967 the price of a share of Q B & R stock varied from $66.67 per share to $50 per share. However, in several transactions just prior to the purchase of a controlling interest in Q B & R by Hedahl's, Inc., the price of a share of stock was in excess of $100. Averaging all Q B & R stock transactions

from June of 1963 up to December 6, 1967, the result is a reconstructed market price of $69 per share. This figure appears to be a reasonable reconstructed market price and, accordingly, will be established as the market value for a share of Q B & R stock. Every share sold after Hedahl's, Inc., exercised its options was purchased for $100 per share. The fact that Hedahl's, Inc., purchased a controlling interest in Q B & R as of December 6, 1967, together with its subsequent purchase of additional Q B & R stock, distorts the actual market value of a share of Q B & R due to the fact that Hedahl's, Inc., was then in a position to control the market. Accordingly, the purchases of Q B & R stock from December 6, 1967, and thereafter, are not properly includible in determining the market value of a share of Q B & R stock. Sporborg v. City Speciality Stores, 35 Del.Ch. 560, 123 A.2d 121 (Ch.1956).

■ We hold that all three methods of valuation must be used in determining the "fair value" of a share of Q B & R stock as of March 8, 1968. We have determined the value of a share of Q B & R stock by each method. The asset value of a share of Q B & R stock is $242.81 per share; the investment or earnings value of a share of Q B & R stock is zero; and the market value of a share of Q B & R stock is $69 per share. Having determined the value of a share of Q B & R stock by each method, the problem becomes one of weighing the various factors to reach a final result that properly takes into consideration all of the elements and factors involved in determining the "fair value" of a share of Q B & R stock as of March 8, 1968. As this is a case of first impression we have had to look to other jurisdictions for guidance in this matter. Perhaps the most experienced jurisdiction in dealing with the valuation of dissenter's stock in corporate mergers is Delaware. The Delaware courts use all three methods in valuing corporate stock. A value is established for each method after which the several values are weighed to arrive at a final determination of the value of the dissenter's share. The following chart indicates the weight given to the several values involved in determining the value of the dissenter's stock although it is clear from a reading of the cases comprising this table that no simple valuation formula exists and that each case was decided on its own particular facts.

DELAWARE ALLOCATION OF WEIGHT FOR VALUE FACTORS

| Asset | Market | Earnings | Dividends | |
|-------|--------|----------|-----------|------|
| 25% | 50% | 25% | .. | 1 |
| 50% | 25% | 25% | .. | 2 |
| 60% | 10% | 30% | .. | 3 |
| 25% | 40% | 25% | 10% | 4 |
| 50% | 25% | 25% | .. | 5 |
| 20% | .. | 80% | .. | 6 |
| 40% | .. | 60% | .. | 7 |
| 20% | 30% | 25% | 25% | 8 |
| 40% | 30% | 30% | .. | 9(a) |
| 20% | 45% | 35% | .. | 9(b) |
| 50% | 25% | 25% | .. | 10 |

Source: 79 Harv.L.Rev. 1453, supra, updated to present.

1. In Re Olivetti Underwood Corp., 246 A.2d 800 (Del.Ch.1968).
2. Poole v. N. V. Deli Maatschappij, 243 A.2d 67 (Del.Supr.1968).
3. Swanton v. State Guaranty Corporation, 42 Del. Ch. 477, 215 A.2d 242 (Ch.1965).
4. Application of Delaware Racing Association, 42 Del.Ch. 406, 213 A.2d 203 (S.Ct.1965), affirming 42 Del.Ch. 175, 206 A.2d 664 (Ch.1965).
5. Levin v. Midland-Ross Corporation, 41 Del.Ch. 276, 194 A.2d 50 (Ch.1963).
6. Felder v. Anderson, Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278 (Ch.1960).
7. Sporborg v. City Specialty Stores, 35 Del.Ch. 560, 123 A.2d 121 (Ch.1956).
8. Heller v. Munsingwear, Inc., 33 Del.Ch. 593, 98 A.2d 774 (Ch.1953).
9. Jacques Coe & Co. v. Minneapolis-Moline Co., 31 Del.Ch. 368, 75 A.2d 244 (Ch.1950), (a) Preferred stock (b) Common stock.
10. In re General Realty & Utilities Corporation, 29 Del.Ch. 480, 52 A.2d 6 (Ch.1947).

■ In weighing the various values involved we have considered all aspects of Q B .& R as a "going concern" prior to its merger with Hedahl's, Inc. Although we have assigned weights to the several values involved, we have not used any set formula; rather, we have relied on an analysis of the particular facts of this case as being determinative of the weight given each value. We have assign-

ed a weight of 25% to the market value of Q B & R. Normally, where there is an established market for the stock of a corporation the market price is given great weight. In other cases where there is no reliable market and none can be reconstructed, market price is not considered at all. However, as to the Q B & R stock, there has been a limited market such that we can properly reconstruct a realistic market price for a share of Q B & R stock. Application of Delaware Racing Association, *supra;* Vought v. Republic-Franklin Insurance Co., *supra.* We have assigned a weight of 50% to the asset value of Q B & R. Normally, a higher value is assigned only in cases where the primary purpose of the corporation is to hold assets, such as real estate, for the purpose of allowing them to appreciate in value. Swanton v. State Guaranty Corporation, 42 Del.Ch. 477, 215 A.2d 242 (Ch.1965); In re General Realty & Utilities Corporation, 29 Del.Ch. 480, 52 A.2d 6 (Ch.1947). In other words, assets are weighed more heavily when they are held for appreciation purposes rather than for commercial retail or wholesale purposes designed to generate earnings. Here the assets of Q B & R primarily consisted of inventories for sale and the necessary buildings and equipment to carry out this business purpose. The inventories held by Q B & R would depreciate in value rather than appreciate but the value of the lots and buildings is substantial in relation to the inventories and will likely appreciate in value. We have assigned a weight of 25% to the investment or earnings value of Q B & R. Normally, in a commercial business, earnings are given great weight as the primary purpose of the business is to generate earnings and not to hold assets that will appreciate in value. Sporborg v. City Specialty Stores, *supra;* Felder v. Anderson, Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278 (Ch.1960). Q B & R was such a business, whose primary purpose was to generate earnings for its shareholders. The fact that Q B & R has failed in the past several years to generate such earnings does not mean that earnings are not an important part of the value of Q B & R stock. In re Olivetti Underwood Corp., 246 A.2d 800 (Del.Supr.1968); Application of Delaware Racing Association, *supra.* However, after Hedahl's had purchased control, a new board of directors was elected in December 1967. This resulted in new and, we believe, improved management of Q B & R. Although earnings should ordinarily weigh heavily in determining the true value of the stock in a commercial corporation, we believe, under the circumstances, it is proper to give less weight in this case. Accordingly, we have determined that the "fair value" of a share of Q B & R stock as of March 8, 1968, is $138.65 per share.

| | Value | x | Weight | = | Result |
|---|---|---|---|---|---|
| Asset | $242.81 | x | 50% | = | $121.40 |
| Market | 69.00 | x | 25% | = | 17.25 |
| Earnings | 0.00 | x | 25% | = | 0.00 |
| | | | Total Value Per Share | | $138.65 |

It is therefore our decision that the plaintiffs have judgment against the defendant for the amount of said "fair value" of the respective shares of stock in Q B & R as of March 8, 1968, at a rate of $138.65 per share, together with the legal interest thereon from that date. Such value per share shall be paid to the plaintiffs only upon surrender of their shares to the corporation.

We therefore direct that the judgment be modified to conform to this opinion and as modified, it is affirmed.

KNUDSON and STRUTZ, JJ., concur.

RALPH J. ERICKSTAD, J., deeming himself disqualified did not participate; NORBERT J. MUGGLI, Judge of the Sixth Judicial District, sitting in his stead.

PAULSON, Judge (dissenting in part).

I dissent to the total value per share determined by the majority in the instant case. As this issue is one of first impression in North Dakota, the majority sought

the experience of other jurisdictions and, in so doing, concluded that the State of Delaware had the most litigation in this area of law. The majority found that the Delaware cases indicate that all of the relevant factors which may affect the value of shares of stock owned by minority shareholders must be examined and appropriate weight accorded, based upon the facts and circumstances of the particular case, when considering the market value method, the asset value method, and the investment value method. Thus the particular facts of each case are determinative of the weight given each method. It is my opinion that the majority has given an inordinate amount of weight to the testimony given by the Hedahls in this action. This point is demonstratively illustrated by the similarity in the total-value-per-share evaluation found by the majority and the estimated value as expressed by the Hedahls. Certainly the self-serving nature of the testimony given by the testifying litigants must be considered. The majority has discounted much of the testimony of an expert, Charles Bailly, a certified public accountant and an attorney. Although admittedly Mr. Quanrud's witness, Mr. Bailly's vast experience in corporate accounting and law must be given greater weight than has been given by the majority. Mr. Bailly emphasized the fact that Q B & R had been a close corporation for many years and thus that a market value method of evaluation would be artificial in nature. Mr. Bailly relied primarily on the asset value of the corporation in making his determination. Little mention was made of the earnings except to demonstrate that losses had been incurred by Q B & R for several years prior to the merger. However, it must be noted that these losses were due primarily as the result of vast reductions in corporate surplus for several years prior to the merger. The reasons for the reduction of surplus were not specifically given at the time of trial. Obviously any number of reasons could be given by way of explanation for this type of activity. Suffice to say that while the earnings of the corporation would ordinarily determine the value of that corporation from an investor's standpoint, in a close corporation with surpluses greatly reduced, the earnings perhaps played a far less part in the value of stock than, for example, an increase in value when one obtains controlling interest. Thus it is my opinion that had the majority considered all of the factors supporting the methods of evaluation, such as was required by the holdings of the cases which the majority cites, the majority would then have made a more equitable determination by allocating a sixty-five per cent weight to the asset value, a ten per cent weight to the market value, and only a twenty-five per cent weight to the earnings value. Thus we would have a situation where we would take sixty-five per cent of the recognized asset value of $242.81, or $157.83; ten per cent of the estimated market value of $69.00, or $6.90; and twenty-five per cent of the earnings value, which is zero. Then our total value per share would be increased to $164.73. This is a value far less than that estimated by the Hedahls. I consider this to be a more equitable evaluation than that found by the majority, as I have given more consideration to the testimony of the expert witness, Mr. Bailly; while I have also given some weight to the market value as testified to by the Hedahls.

NORBERT J. NUGGLI, District Judge, concurs.