# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### January 20, 2016 Session

## CATHY TURNBO FRANKS v. RONALD FRANKS

**Direct Appeal from the General Sessions Court for Hardin County**
**No. 7706      James Y. Ross, Judge**

---

**No. W2015-01525-COA-R3-CV – Filed February 29, 2016**

---

This is the second appeal of this case involving various financial issues relative to a divorce. Husband appeals the trial court's determination of several factual findings relative to alimony, including Wife's ability to secure employment, Husband's ability to earn in the future, the award of attorney's fees to wife, and the value of several marital assets divided in the property division, including the value of an LLC jointly owned by the parties. We now vacate the order of the trial court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Vacated and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

J. Gilbert Parrish, Jr., Savannah, Tennessee, for the appellant, Ronald Franks.

Chadwick G. Hunt, Savannah, Tennessee, for the appellee, Cathy Turnbo Franks.

## OPINION

### BACKGROUND

This is the second appeal of this case. This Court previously related the facts of this case in *Franks v. Franks* ("Franks I"), No. W2014-00429-COA-R3-CV, 2015 WL 58913 at *1-5 (Tenn. Ct. App. Jan. 2, 2015):

> Ronald Franks ("Husband") married Cathy Turnbo Franks ("Wife") on April 11, 1986. The Franks were married for twenty-seven years. They separated in February 2011, and Wife filed her complaint for divorce on

September 26, 2011. The Franks had two children who reached majority by the time of the divorce trial. The parties jointly owned a one-half interest in Ronald Franks Construction, LLC ("the LLC"), a construction business. During the marriage, the parties acquired considerable property, including a marital home, a river lot home, and several pieces of unimproved real property. The parties also acquired stock and investment accounts, a luxury motor home, and other personal property. On October 19, 2011, Husband filed an Answer and Counter Complaint to the Complaint for Divorce.

On September 9, 2013, the trial court entered an Agreed Order and Approval of Stipulations. The order stated that the parties had agreed to settle the issue of the ground for divorce before trial, and that the ground for divorce was separation for two or more years pursuant to Tennessee Code Annotated Section 36-4-101(a)(15).

The divorce trial occurred on December 5, 2013. As a preliminary issue, at trial, counsel for both parties stated that they had stipulated to the admissibility of two binders of documents without objection to the custodian of the records not being present. The binders included 842 pages of the parties' financial documents, including "tax returns, financial information, bank statements and other matters." The parties also stipulated that "fault of either party will not be considered by the Court for any purpose, including for purposes of spousal support, or obviously grounds for divorce."

At trial, both parties and the LLC's bookkeeper testified. Wife testified that she was fifty years old. She explained that she had been working at a restaurant for around a year and a half during the divorce proceedings. At the restaurant, she "either work[s] on the buffet, or I might waitress one night a week. And I run the cashier, too." Although her salary varied weekly, she testified that she usually made around $160.00 per week. Some weeks she said she made significantly less. She also received $1,200.00 per month in child support from Husband even though the younger of the parties' children, the minor child she had been receiving support for, had reached the age of majority. All together, she testified, her income was around $2,000 per month.

Regarding the LLC, Wife testified that she believed she was a "member or a partner" of the LLC. She stated that she was involved in its operations as a bookkeeper when the LLC first began. She testified that later on the LLC

outgrew her bookkeeping abilities, stating that "[the LLC] grew so fast that it just got where I couldn't do it any more." Although she did not keep the books any more for the LLC, she stated that she still "helped do stuff in the office, and cleaned the office, and done a lot of things."

Wife also testified about her educational and vocational background. Although she graduated high school, she had no college education. She testified that she had taken some courses to become certified as a court reporter, but did not finish the course work. She also stated she "[didn't] know of any reason" preventing her from returning to finish her training to become a court reporter. However, Wife also stated that it was unlikely at this point in her life for her to go back to school. She testified that she intended to remain in the restaurant business, but that she would never be able to "rise to the level of income that [Husband's] capable of making." On cross-examination, Wife admitted to additional work experience during the marriage, including work at a sewing machine factory, as well as assembly line work at Tennessee River Manufacturing and Johnson Controls.

According to Wife's testimony, the parties had two children together. Wife testified that the parties made a mutual decision for her to stay home and raise the children. Although both children had reached the age of majority at the time of trial, the parties' daughter still resided with Wife. Wife stated that the parties' son lived in their river lot home, while Husband lived "down below it." Despite claiming that there was a large discrepancy in her and Husband's incomes, she answered she "ha[d] no idea" as to what Husband's income was. In response to a question regarding the LLC's obligations and whether Husband was personally liable for them, Wife stated, "I'm sure he [is]."

Wife further testified that she still resided in the parties' marital home, and that Husband continued paying the mortgage as Wife could not afford to make the payment on the home. She valued the home at $430,000.00, but affirmed that there was approximately $250,000.00 in debt on the home. When asked whether it would be "much more practical and reasonable to keep and maintain" the river lot home than the marital home, Wife stated, "In the yard, yes." She testified that the river lot home was different than the marital home in several respects, including lacking a swimming pool, lacking a garage, and having considerably less square footage. According to Wife, however, the river lot home was newer. Still, she said the reason she did not want to live there, rather than Husband, was because "That's

3

not my home."

Wife also testified about the money she would need in order to continue to live in a manner relatively similar to what she had in the past. When asked about the specific amount of alimony she needed, she stated she thought "$5,000 a month is fair." She testified that she would use part of that money to pay for a car, a place to live, and health insurance for herself. Regarding her attorney fees, Wife stated that she was only able to afford an attorney because of her father's assistance.

Husband testified that he was also fifty years old at the time of trial, and that he worked for his own construction business, the LLC, which he began in April 1996. When asked about the LLC's financial status, Husband replied, "It's not good." He explained that the LLC had previously found niche work with pipeline companies and within the fiber optic market, but "there's not really been another great nitch [sic] since then. Now we do a lot of sewer, water, municipal type work. We do a lot of—some construction management. We've done quite a bit of that on some schools. That's not been good at all." In his testimony, he reasoned that the decline was due to the economic downturn. Husband testified that the LLC was able to remain in business throughout the last five years because it worked off credit lines and borrowed money. According to Husband, the LLC had to sell some mortgaged pieces of equipment and liquidate $658,506.81 in certificates of deposit, all of which Husband says were used to satisfy the LLC's debts. Further, Husband stated he is personally responsible for a $436,138.33 loss in equity as stated on the LLC's balance sheet.

Husband also testified that the LLC used accrual accounting for certain years, and thus, the recorded profit of $724,306.00 for the year 2011 had not actually been fully collected by the LLC. The next year, in 2012, according to Husband, the recorded profit was $830,000.00, but that amount had not been fully collected by the LLC. Husband also testified that a few years earlier, in 2010, the LLC suffered a loss of $1,617,000.00, but on a cash accounting basis. This loss was reflected on the LLC's tax return for that year. Several of these losses occurred when, according to Husband, money was stolen during the jobs he had in Louisiana, which Husband referred to as "a den of thieves."

Due to the LLC's downturn, Husband stated that his standard of living has "definitely" changed. He revealed that he had been living in the parties' motor home that was parked on the river lot property. He testified that, at

the time of trial, he did not have the ability to repay all the debt he owed, and that he would have to liquidate some assets in order to pay it. According to Husband, his monthly income was "somewhere around $7,200.00 a month," or $1,800 per week, paid by check from Ronald Franks Construction. However, he also testified that he "[wouldn't] be surprised" if his bank records reflected more had been deposited into his account than that. Husband explained that "[t]here are months that I get paid more." Some of the payments from the LLC reflected in his bank account, according to Husband, constitute reimbursement for when he turns in his cash receipts. He stated he would be unable to afford Wife's request of $5,000.00 per month alimony.

From December 9, 2011 through June 9, 2013, Husband charged $79,645.94 on his business credit card, amounting to, on average, $4,191.89 per month. He testified that around half of these charges, approximately $2,095.94 per month, were personal charges. According to Husband, these personal charges were in lieu of a *per diem* that a company would typically extend to its employee during out-of-town work. His credit card expenses, he stated, were for everyday items, including groceries, and business expenses, including a "motel, an RV spot, my food." Sometimes, Husband stated, on out-of-town jobs, Husband would charge food to the credit card to feed his employees. Husband testified that, "I do not draw a per diem. I get—everything that I do gets paid." Husband provided that his business credit card is the only card in his possession. The LLC's bookkeeper, Ms. Willoughby, testified that she paid all of the monthly balances on the business credit cards. There is no evidence that Husband reimburses the LLC for any charges made on his business credit card, including those classified as "personal," as, according to Husband, they are in lieu of a *per diem.*

Regarding other expenses, like restaurant bills and golf tabs, Husband stated:

> I can definitely explain to the Court what that's about. I have clients that come in and out, and that I try to get in with. Well, one of the ways that you do that is you buy their supper, and you buy their lunch, and you buy them a round of golf somewhere. I have no marketing people whatsoever. Every bit of marketing that happens at Ronald Franks Construction comes from Ronald Franks going out and beating bushes and meeting people. And that's what you have to do. You know

5

what salesmen do.

Husband also testified that some of the money is spent on his marketing tactics through his attendance at car races and buying gifts for potential clients. Further, Husband stated that he had to have "continuing education" in at least three states to maintain his license in those states. According to Husband, the company "absolutely pays for it." Husband stated that he has "gone on cruises to obtain that continuing education." During cross-examination, Husband admitted that he had gone on a particular cruise "for pleasure," but the man who invited him on this particular cruise reimbursed him via check payable to Ronald Franks Construction.

The last witness to testify at trial was Brenda Willoughby. Ms. Willoughby is an employee of the LLC. Her job responsibilities include handling the LLC's checking accounts, other banking accounts, and some of the credit card bills. She also pays Husband's personal bills. She testified that she pays Husband a salary of $1,800.00 per week. Ms. Willoughby also explained that the purported profit for year 2011 in the amount of $724,000.00 was an accrual, not cash. Like Husband, she also testified that the cruise Husband took for pleasure was fully reimbursed by the man Husband went on the cruise with in the amount of $3,700.00. Finally, Ms. Willoughby testified regarding the LLC's revolving credit lines.

Following Ms. Willoughby's testimony, the trial court took a short recess before ruling. The trial court's oral ruling was later incorporated by reference into its written order. The trial court found that the parties had the same formal education, but "based on the proof[,] the wife has no special skills and very few transportable job skills that she could use in the workforce at her age to earn anything more than—or much more than what she's earning right now." The trial court explained that most of Wife's work experience "was at factories doing a type of production work," and "that doesn't exist in this part of the country any more. And none of those skills would allow her [to] transfer over to other jobs that may be available in the United States economy, but certainly not the Tennessee economy workforce." On the contrary, the trial court stated that "[Husband], with a general contractor's license, has special skills that would allow him to continue his course of employment indefinitely in today's economy. Certainly I don't believe that the economy is as good now as it was in 2008 and before, but based on Mr. Frank's testimony they have a lot of work and are making a lot of money." The trial court also mentioned that Wife's

contributions to the marriage allowed the business to grow.

The trial court also found that, "Dividing the assets in this marriage is a little bit difficult because it appears to the Court from reviewing the exhibits, and listening to the proof, there has been some commingling between the business ... and the individual assets of the parties." Ultimately, the trial court ordered the marital home where Wife was residing to be sold within nine months of entry of the final decree. Also, the court stated that Wife "ought to clear equal to what [Husband] paid for the river cabin at approximately $215,000.00." Wife was awarded the furnishings from the marital home, and Husband was awarded the furnishings from the river lot home. Husband also received the parties' motor home and its associated debt. The court then divided up the items of personal property.

The court noted that Wife did not put on any proof to contradict Husband's evidence of the value of the LLC at negative $218,000. Regarding the LLC, the court stated that it did "not believe that the business has a $218,069.16 negative net worth." The court also found that, "I think that business is making a lot of money, a lot more than what—what was testified to here today, and the lifestyle of the parties, at least in the continued purchases of [Husband] during the pendency of the divorce indicates to me that, you know, he has a great credit score." To this end, the court stated that since it "can't rely on any testimony as to what the business would be worth," it would award the business to Husband without dividing its equity.

Relying on proof related to Husband's income, the trial court calculated Husband's income at $16,000.00 per month. It found that there were at least $10,000.00 in payments made each month to his account, and he was getting the benefit of $4,500.00 per month of credit card charges, without taking into account whether the charges were personal or for the LLC. Since that would be approximately $6,000 per month if he was paying taxes on the $4,500.00 amount, the court approximated his income at $16,000.00 per month.

From Husband's income, the trial court found that Wife's "request of $5,000 a month [for alimony] is very reasonable, probably less than what I would have awarded based on the math." This was designated as alimony *in futuro*.

The trial court also found that the parties' valuation of the 2008 Monaco

Dynasty Yorkshire, the parties' motor home, was not a "fair representation of the value." The trial court explained

> I saw a picture of it in there. I think that that is undervalued, and if it's done as that item then I don't think that as to some of the items that are shown in the—or some of the valuations of this property that's used in the income tax return would be devalued, as well. And, of course, if it's not devalued they're going to get the benefit of the depreciation, so it's a win, win for the—for the business, and a lose, lose for [Wife].

The trial court entered the Final Decree of Divorce on February 21, 2014. The order provides that Husband is ordered to pay Wife $5,000.00 per month alimony *in futuro* "finding that [Husband] has the ability to pay alimony in futuro and [Wife] has the need for support in light of the differences between her income and [Husband's]." The trial court reserved ruling on the amount of attorney's fees, but ordered Husband to pay the cost of the cause once Wife's counsel submitted an affidavit in support of his fees. Wife's counsel filed his affidavit on March 3, 2014, and the trial court entered an order on the same day approving the $15,000.00 in attorney's fees.

Husband appealed the trial court's order, arguing that the trial court erred in establishing alimony based on factual findings Husband claimed were unsupported by the preponderance of the evidence, and that the trial court erred in awarding Wife $5,000 of alimony per month and her attorney's fees. In addition, Wife argued that the trial court erred in its division of Ronald Franks Construction, LLC. In *Franks I*, we determined that the trial court's ruling did not include the value of the LLC—"one of the largest marital assets owned by the parties and capable of producing income into the future"— and vacated the trial court's ruling on the division of marital property and with regard to alimony. 2015 WL 58913 at *10. We remanded the case to the trial court with specific instructions to specify the basis for its determination of the LLC's and motor home's values and to reconsider its decisions with regard to alimony and property division in light of the value assigned to that property. *Id.* We declined to address all other issues raised by the parties as they would be affected by the decision of the value of the LLC and motor home. *Id.*

On remand, the trial court made additional findings of fact and conclusions of law in its amended final decree of divorce. In its conclusions of law, the trial court granted the parties an absolute divorce on the parties' stipulated ground and granted Wife a

8

divorce on the ground of inappropriate marital conduct. The trial court specifically found Wife to be a credible witness but found Husband not to be a credible witness based on his

> lack of candor, evasiveness, attempts to slant or color his testimony regarding the company's financial position, personal financial status, value of marital assets, including the company, homes, motor [home], etc. …, amount of debts owed, and attempts to disregard, downplaying or misrepresentation of the contributions of his wife to his personal life, family and business, and other observed demeanor….

The trial court explained that it placed "little, if any, confidence in the bookkeeping procedures used, and financial information stemming therefrom" by Husband with respect to the LLC. The trial court then found that the "weight of the evidence supported using the recorded profits of the years 2011 and 2012 as the most consistent and best evidence to determine the value of the Company/LLC" and that "after examining all the different methods of business valuation in light of the available and applicable financial proof relevant to the Company/LLC, the Income/Profit approach was the best method to estimate the value of the business." Using its chosen method of valuation, the trial court found that the LLC had a fair market value of $777,000 by averaging the LLC's recorded profits of $724,306 in 2011 and $830,000 in 2012. Consequently, the trial court found that Husband's interest in the LLC had a fair market value of $388,500. In its order, the trial court noted that even if it had placed a "zero value" on the LLC, Husband "would still be receiving an equitable division of the martial assets valued at $414,000 and it still would not change [its] analysis of the facts. . .in conjunction with the statutory factors for awarding alimony in this divorce proceeding."

With regard to the parties' motor home, the trial court found that it had a gross fair market value of $291,000 but a debt in the amount of $291,000 and thus a net fair market value of zero. The trial court noted that

> In the alternative, the Court, based on the proof, could also find the fair market value of the luxury [motor home] was $166,000.00, and again, based on the proof, determined the debt of $291,000.00 was not secured and was a debt of the business/company, and not a [marital] debt of the parties. However, the end result for the division of the parties' [marital] assets would be unchanged by this variation.

After considering the applicable statutory factors set forth in Tennessee Code Annotated section 36-5-101 and the monthly incomes of the parties, the trial court awarded Wife alimony *in futuro* in the amount of $4,000 per month. In addition, the trial court found that Wife was "the prevailing party, and Husband has the financial ability to pay Wife's

attorney fees" and awarded Wife $15,000 in attorney's fees. Husband now appeals.

## ISSUES

Husband presents four issues on appeal, which we restate slightly:

I. Whether the trial court erred in establishing alimony based on factual findings which were unsupported by the preponderance of the evidence presented at trial.

II. Whether the trial court erred in concluding that Wife had a need to receive $4,000 of alimony per month.

III. Whether the trial court erred in awarding Wife her attorney's fees in connection with the divorce trial.

IV. Whether the trial court erred in granting the Wife the divorce on the grounds of inappropriate marital conduct *sua sponte*.

## ANALYSIS

## I.

On this second appeal, the crux of this case is whether the trial court erred in establishing alimony based on findings of fact that Husband claims are unsupported by the preponderance of the evidence. Therefore, we begin our analysis with the factual findings that Husband claims improperly supported the trial court's award of $4,000 per month alimony *in futuro* to Wife.

### Value of the LLC

As we said in *Franks I*, the valuation issues regarding the division of the parties' marital property permeate all the issues raised by the parties.

The value of marital property is a question of fact. *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007). As fact finder, the trial court is free to place a value on a marital asset that is within the range of the evidence presented. *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). A trial court's valuation and distribution of marital assets will therefore be given great weight on appeal and will not be overturned unless the evidence preponderates against those findings or they are inconsistent with the factors outlined in Tennessee Code Annotated section 36-4-121(c). *Owens*, 241 S.W.3d at 486; *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998).

10

Ronald Franks Construction, LLC is a limited liability corporation, "a type of entity that is akin to a closely held corporation for purposes of valuing it as a marital asset." *Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818 at *4 (Tenn. Ct. App. July 28, 2009) (citing *Powell v. Powell*, 124 S.W.3d 100, 104 (Tenn. Ct. App. 2003)). While Tennessee law recognizes a number of acceptable methods to calculate the value of a corporation, "it is particularly important . . . to note that 'determining the value of a closely held corporation is not an exact science. . . .'" *Inzer*, 2009 WL 2263818 at *4 (quoting *Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn. Ct. App. 1995) (citation omitted)). Our supreme court has recognized three of these methodologies: (1) the market value method, (2) the asset value method, and (3) the earnings value or capitalization of earnings method. *Blasingame v. Am. Materials, Inc.*, 654 S.W.2d 659, 666 (Tenn. 1983), *superceded on other grounds by* Tenn. Code Ann. § 47-8-102 (1992 Repl. & Supp. 1998). As we noted in *Inzer*, the *Blasingame* court detailed the methods as follows:

> The market value method establishes the value of the share on the basis of the price for which a share is selling or could be sold to a willing buyer. The method is most reliable where there is an established market for the stock. The asset value method looks to the net assets of the corporation valued as a 'going concern,' each share having a pro rata value of the net assets. The net assets value depends on the real worth of the assets as determined by physical appraisals, accurate inventories, and realistic allowances for depreciation and obsolescence. The investment value method relates to the earning capacity of the corporation and involves an attempt to predict its future income based primarily on its previous earnings record. Dividends paid by the corporation are considered in its investment value. Generally, all the elements involved in these methods are considered in determining the value of the dissenter's stock.

*Id.* (*quoting Brown v. Hedahl's-Q B & R, Inc.*, 185 N.W.2d 249, 254 (N.D. 1971)).

The method or combination of methods used depends on the unique circumstances of each corporation, for reasons discussed in *Wallace*:

> A public corporation's value is most reliably determined using the market value method. This method presumes that there is an established market for the corporation's stock which will enable the court to arrive at the price a willing buyer would pay for the stock. The stock in closely held corporations is rarely traded. Thus, it is improper to attempt to place a value on a closely held corporation using the method generally used to

11

place a value on a public corporation.

*Wallace*, 733 S.W.2d at 107 (citations omitted).

In *Inzer*, we noted that while not bound by it, Tennessee courts suggest Internal Revenue Service Revenue Ruling 59-60 provides standard guidelines to value such a business. *Inzer*, 2009 WL 2263818 at *6 (citing *e.g., Anderson v. Anderson*, No. E2005-02110-COA-R3-CV, 2006 WL 2535393, *3 (Tenn. Ct. App. Sept. 5, 2006); *Wallace*, 733 S.W.2d at 107). Revenue Ruling 59-60 supplies a number of factors to consider: (1) the nature of the business, including its history since incorporation; (2) the economic status of the industry and the nation at the time of the valuation; (3) the book value of the business; (4) the business's earnings; (5) the business's dividends and paying capacity; (6) any goodwill or other intangible value; (7) the size of the stock and prior stock sales; and (8) the selling price of comparable securities relative to earnings, asset values, and dividends. Rev. Rul. 59-60 (1959). "Any life insurance proceeds covering the sole or controlling shareholder may also be considered." *Inzer*, 2009 WL 2263818 at *6 (citing *Wallace*, 733 S.W.2d at 107-08).

In this case, no valuation experts testified. Frankly, this is precisely the kind of case where expert testimony would be extremely useful to the trier of fact and to this court. The trial court determined that Husband was not credible and therefore "placed little, if any confidence in the bookkeeping procedures used…." The trial court placed "little, if any, weight on the Company/LLC's tax return for the year 2010, especially in light of Defendant/Husband's explanation for the sizeable loss in 2010 and lack of profit in 2013…." However, the trial court found that "the proof showed the profit[1] of the Company/LLC in 2011 and 2012[2] was very consistent, and appeared to be the best evidence to use to determine the value of the Company/LLC, considering all of the different methods of business valuation." The trial court went on to say "the Court found the weight of the evidence supported using the recorded profits of the years 2011 and 2012 as the most consistent and best evidence to determine the value of the Company/LLC. Finally, the Court further found, after examining all the different methods of business valuation in light of the available applicable financial proof relevant to the Company/LLC, the Income/Profit approach was the best method to estimate the value of the business."

Based on the written findings and the trial court's oral statements, we cannot discern that the trial court used any method espoused in *Blasingame* or any of the factors

---

[1]The figures referred to by the trial court as "recorded profits" are the "Ordinary business income" from Line 22 of the LLC's 2011 and 2012 Form 1065 IRS Tax Statements.

[2]In its Final Decree of Divorce, the trial court noted that it "placed its confidence in the recorded profits of the years 2011 and 2012 when this case was dormant as opposed to the year of 2013, when this case was being actively litigated and prepared for trial."

12

enumerated in Revenue Ruling 59-60. We cannot discern *how* the trial court applied its "Income/Profit approach" and *how* it valued the business.[3] While not necessarily true in every case involving business valuation, we question whether the business at issue in this case can properly be valued without the trier of fact being assisted by a properly qualified expert witness or witnesses. Based on the foregoing, we cannot say that the trial court's factual findings with regard to the value of the LLC are supported by the evidence. Accordingly, we vacate the trial court's finding with respect to the value of the LLC.

### The LLC's Cash on Hand

In discussing the value of the LLC in its oral ruling, the trial court stated:

> I noticed through the course of the testimony that there was never any indication that the business was floundering for lack of available cash capital to pay the bills, even though some of that was attributed to the - - credit line, it appears just from looking at the tax returns about from one year to the next about a million dollars cash on hand is available in order to conduct the business.

The amount of cash on hand may figure into the trial court's valuation of the LLC, but as noted above, the trial court did not use any valuation method supported by Tennessee law. In fact, the LLC's 2012 income tax return reflects that the LLC had just $205,290 cash on hand at the end of the tax year, rather than the $1,000,000 stated by the court. This discrepancy underlies the advisability of expert testimony with respect to the valuation of a closely held corporation and its finances. Again, the trial court's factual findings in this regard are not supported by the evidence in the record, thus we vacate the trial court's findings with respect to the LLC's cash on hand.

### Value of the Parties' Luxury Motor Home

The trial court found that the parties' 2008 Monaco Dynasty Yorkshire had a gross fair market value of $291,000, but a debt in the amount of $291,000, and thus a net fair market value of zero. At trial, the parties offered competing gross fair market values of $166,000 and $175,000. Here, the trial court's valuation of the motor home's gross fair market value far exceeded that of both the parties. In its oral ruling, the trial court stated that it did not find Husband's valuation of the motor home to be a fair representation of its value and that "I saw a picture of it in there. I think that that is undervalued." While the trial court's decisions with regard to the value of marital assets are given great weight on appeal, the record simply does not support the trial court's finding that the motor

---

[3]Our review of the record indicates that the trial court's "Income/Profit approach" may have simply involved averaging the LLC's "recorded profits" in 2011 and 2012.

13

home is worth $291,000, when both parties agree the value is significantly lower. Accordingly, we must vacate the order of the trial court with respect to the value of the parties' luxury motor home and remand for further proceedings.

### *Wife's Ability to Work*

Husband next contends that the trial court erred in finding that Wife would be unable to secure employment beyond the waitressing job she held at the time of trial. The trial court specifically found that "it would not be reasonable or feasible to attempt to rehabilitate Wife in light of her age, education and lack of transferable job/vocational skills and training." The trial court's decision appears to be based, in part, on its statement that Wife's work experience prior to becoming a homemaker was

> at factories doing a type of production work. For the most part that [type of work] doesn't exist in this part of the country anymore. And none of those skills would allow her or transfer over to other jobs that may be available in the United States economy, but certainly not the Tennessee economy workforce.

While Wife did testify that she held a number of manufacturing jobs prior to becoming a homemaker, neither party introduced evidence regarding the current availability of that type of work. The trial court's statement with respect to the availability of manufacturing jobs is simply not supported by the record. During trial, Wife testified that she attended community college early in her marriage to become a court reporter. She did not finish school but testified that she did not know any reason she could not return and complete that training. She further testified that she had not looked in to any possibilities of vocational training during the approximately three years the divorce had been pending. The record simply does not support the trial court's factual finding that Wife is unable to secure employment beyond the three days of waitressing per week or that she is unable to rehabilitate herself. Accordingly, we vacate the trial court's finding with respect to Wife's ability to work.

### *Husband's Income*

The trial court found that Husband's income was $16,000 per month. The trial court reached this figure by finding that Husband was paid $10,000 per month by the LLC and that he reaped an additional $6,000 per month in company credit card benefits. The record does not support this finding. Husband testified that he earned $7,200 per month, which is supported by the LLC's financial records contained within the record. Instead, the trial judge seemed to adopt arguments made by Wife's attorney at trial suggesting that Husband actually made $10,000 per month. As we have repeatedly held, statements made by counsel are not evidence or a substitute for testimony. *Hathaway v.*

14

*Hathaway*, 98 S.W.3d 675, 681 (Tenn. Ct. App. 2002); *Ballew v. Ballew*, No. W2005-00337-COA-R3-CV, 2006 WL 709198 at *3 (Tenn. Ct. App. Mar. 22, 2006). While the record reflects that there are months where Husband received checks totaling greater than $7,200, Husband claimed the amounts over his typical salary were repayments for company expenses he paid from his own personal funds. There are a significant number of months where Husband received only $7,200 in checks from the LLC. While we are required to give great deference to the trial court with respect to its findings of credibility, and we note that the trial court did not find Husband to be a credible witness, we also note that Brenda Willoughby, the LLC's bookkeeper, testified that Mr. Franks earned $7,200 per month. The trial court's order does not include credibility findings with respect to Ms. Willoughby.

However, the additional $2,800 per month imputed to Husband's income is not as concerning as the $6,000 per month imputed due to Husband's alleged personal use of the LLC credit card. Between December 9, 2011 and June 9, 2013, Husband charged $79,645.94 to the LLC's credit card. In his testimony, Husband admitted to using the LLC credit card for personal purchases and that "about fifty percent" of the purchases were personal purchases. Although Wife put on no proof to the contrary, in its findings, the trial court seemingly rejected Husband's testimony with respect to the credit card and instead imputed the entire amount of the charges to Husband's income, at an average of $4,191.89 per month. Ms. Willoughby, the LLC's bookkeeper, testified that at least $3,700 of those charges, for a cruise, had been paid back to the LLC. The trial court then increased that figure to $6,000 because "[t]hat [$4,191.89] would be $6,000 if he was paying taxes on that, so that's where I'm coming up with my $16,000."

The findings of the trial court that are dependent on the credibility of witnesses are entitled to great weight on appeal. *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991) (citing *Town of Alamo v. Forcum–James Co.*, 327 S.W.2d 47, 49 (Tenn. 1959)). However, in this case, the findings of the trial court with respect to Husband's income are not supported by the evidence in the record. Nothing in the record supports the trial court's finding that one hundred percent of the credit card charges were for personal use or that they should be imputed to Husband's income. At most, the evidence could support a finding that half the charges were for personal use, based on Husband's testimony. In addition, the trial court increased Husband's monthly income based on an undefined tax benefit to Husband for expenses charged to the LLC's credit card. The record is devoid of evidence of tax rates that could have or should have been properly applied. Accordingly, we must vacate the trial court's decision with respect to Husband's income and remand for further proceedings.

### Husband's Future Employment

With respect to Husband's ability to make money through future employment, the

trial court made a finding of fact as follows:

> On the other hand, Mr. Franks, with a general contractor's license, has special skills that would allow him to continue his course of employment indefinitely in today's economy. Certainly I don't believe that the economy is as good now as it was in 2008 and before, but based on Mr. Franks' testimony they have a lot of work and are making a lot of money. Now it appears that they have lost some money from looking at tax returns over 2010, 2011, 2012. But they certainly are making a considerable amount of money.

The trial court's finding implicitly rejects Husband's testimony regarding the LLC's financial status, which the trial court has discretion to do, but is also based on a business valuation made in error. Because Husband's ability to earn income is a relevant factor for the trial court to consider in making its award of alimony,[4] the trial court must reconsider its finding with respect to Husband's future employment in a manner consistent with a proper valuation of the LLC. Accordingly, we vacate the trial court's finding with respect to Husband's future ability to generate income.

### *Leaning Tree Lots 41 and 42 and the River Building*

The trial court found that the parties' Leaning Tree Lots 41, 42, 78 and 79 had a combined gross market value of $97,000, debt of $61,000, and a net fair market value of $36,000. The trial court awarded the Leaning Tree Lots to Wife. However, the trial court also awarded the parties' "river building and real property on which it is situated" to Husband. The trial court found that the river building had a gross fair market value of $80,000, debt of $80,000 debt, and a net fair market value of zero. The problem with this division is that the river building is located on Leaning Tree Lots 41 and 42, which the trial court awarded to Wife. Both parties agree this division was made in error.

With respect to the trial court's division of Leaning Tree Lots 41 and 42, and the river building, we vacate the trial court's finding and remand for further proceedings.

The factual findings discussed herein cause somewhat of a domino effect. The factual findings implicate the division of marital property, which ultimately implicates the award of alimony. Because we vacate the factual findings discussed herein, we must also vacate the trial court's division of marital property and the trial court's alimony determinations.

### II. Wife's Need of $4,000 per month

Husband's second issue challenges the amount of alimony the trial court awarded

---

[4]*See* analysis *infra* Part II.

to Wife. The Tennessee Supreme Court recently discussed the standard of review applicable to a trial court's decision on matters of alimony in detail in *Gonsewski v. Gonsewski*:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson,* 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce ... the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor...."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton,* 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew,* 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree,* 16 S.W.3d 356, 360 (Tenn. 2000).

> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard,* 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew,* 40 S.W.3d at 470; *Robertson v. Robertson,* 76 S.W.3d 337, 340-41 (Tenn.2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard,* 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent,* 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson,* 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright,* 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.,* 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among

several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson,* 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher,* 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright,* 337 S.W.3d at 176; *Henderson,* 318 S.W.3d at 335.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011) (footnote omitted).

In determining whether to award spousal support and, if so, the nature, amount, length, and manner of payment, courts must consider all relevant factors, including, to the extent that they are relevant, the statutory factors listed in Tennessee Code Annotated section 36–5–121(i).[5] Although the court must consider each of the statutory factors relevant to the parties' circumstances, "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski,* 350

---

[5]The statutory factors include:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing, or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be a custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and intangible;
> (8) The provisions made with regard to the marital property, as defined in 36-4-121;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i).

S.W.3d at 110 (citations omitted). Guided by these principles, we consider the trial court's awards of spousal support and the specific circumstances of this case.

The trial court awarded Wife $4,000 per month alimony *in futuro* after considering Wife's "calculated gross income of [$1,200] monthly and living expenses" and Husband's "calculated gross income of [$16,000] monthly and living expenses." The court's award of alimony also considered its determination that Husband was awarded a greater division of the parties' marital property.

While we have already vacated the trial court's findings with respect to its division of marital assets and its determination of Husband's income, Husband also claims that Wife failed to prove a need that would support the trial court's $4,000 per month alimony award. The trial court did not make specific findings with respect to Wife's living expenses, nor did Wife offer any testimony regarding her living expenses at trial. Thus, the trial court's award appears to be based on findings in error. The evidence does not support a finding that Husband earns $16,000 per month, nor does the evidence support a finding that Wife has a need of $4,000 per month, or that Husband has the ability to pay that amount. Similarly, because the trial court's findings with respect to the value of the LLC and the motor home—the parties' largest marital assets—must be reconsidered, so must its award of alimony. Accordingly, we vacate the award of alimony and remand for proceedings consistent with this opinion.

### III.    Wife's Attorney Fees

Husband next argues that the trial court erred in awarding Wife her attorney's fees. In Tennessee, an award of attorney's fees in a divorce case constitutes alimony *in solido*. *See* Tenn. Code Ann. § 36-5-121(h)(1); *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011). The decision whether to award attorney's fees is within the sound discretion of the court. *Id.* (citing *Crabtree v. Crabtree*, 16 S.W.3d 356, 361 (Tenn. 2000); *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995)). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Id.* An award of alimony *in solido* for attorney's fees is only appropriate when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, or where the spouse would be required to deplete his or her resources in order to pay them. *Id.* (citing *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. App. 1992)).

Because the trial court must reconsider its award of alimony in a manner consistent with this opinion, we cannot appropriately address this issue. Whether or not Wife is entitled to her attorney's fees depends on the trial court's proper division of marital assets and its findings regarding Wife's employment and income. As such, we also vacate the trial court's award of attorney's fees as alimony *in solido* and instruct the trial court to re-consider this issue on remand.

## IV.    Inappropriate Marital Conduct

Finally, Husband contends that the trial court erred in granting Wife the divorce on the ground of inappropriate marital conduct *sua sponte*.  We agree.  Prior to trial, the trial court approved the parties' agreed stipulation to a no-fault divorce.  After the trial and first appeal of this case, the trial court's amended order stated that "Wife is entitled to an absolute divorce on the grounds of inappropriate marital conduct" in addition to stating the parties "are declared divorced on [their] stipulated grounds."  Husband argues that the trial court may have considered the parties' fault in its decision to award Wife alimony, based on the trial court including Tennessee Code Annotated section 36-5-121 (i)(11) as a relevant factor in its order.  While the record is unclear as to whether the trial court did indeed consider fault in making its alimony award to Wife, we believe that this error highlights the need for the trial court to reconsider its award of alimony. We therefore vacate the trial court's order granting the divorce on the grounds of inappropriate marital conduct.

## CONCLUSION

For these reasons, we vacate the order of the trial court with respect to the award of alimony, attorney's fees, and the grounds for divorce.  Costs of this appeal are taxed to the appellee, Cathy Turnbo Franks, for which execution may issue, if necessary.

_____
BRANDON O. GIBSON, JUDGE