# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 13, 2016 Session

## NORRIS BETTIS v. REBECCA BETTIS

### Direct Appeal from the Chancery Court for Hamilton County
No. 14-0040     Pamela A. Fleenor, Chancellor

---

### No. E2016-00156-COA-R3-CV-FILED-OCTOBER 24, 2016

---

This is an appeal of a trial court's award of alimony and valuation of marital assets. Husband appeals the trial court's decision to award a percentage of his bonus income as alimony as well as the trial court's valuation of stock allocated to Husband. Wife appeals the trial court's decision not to award her alimony in futuro. We affirm both the trial court's finding with respect to the value of the stock and its decision to not award alimony in futuro. However, we vacate the trial court's decision to award a percentage of Husband's bonus income as alimony and remand for proceedings consistent with this opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part, Vacated in part, and Remanded

BRANDON O. GIBSON, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

John R. Meldorf, III, Chattanooga, Tennessee, for the appellant, Norris Bettis.

William H. Horton, Chattanooga, Tennessee, for the appellee, Rebecca Bettis.

## OPINION

### Background & Procedure

Norris Bettis ("Husband") married Rebecca Bettis ("Wife") on November 6, 1982. The parties were married thirty-three years and have four adult children. Husband filed his complaint for divorce on January 20th, 2014. On May 6, 2014, Wife filed an Answer and Counterclaim to the Complaint for Divorce. The trial court heard testimony from a number of witnesses, including Husband and Wife on July 23, 2015, and issued a memorandum opinion and order granting the divorce on August 21, 2015.

Husband, a 65 year old salesman for Tencarva Machinery, testified that he receives a monthly salary of $3,700[1] and also receives a quarterly commission bonus. In 2014, Husband's wages totaled $148,135. Between 2010 and 2013, Husband's wages averaged $159,386, including a low of $128,675 in 2012 and a high of $173,284 in 2013. Husband stated that he expected his income for 2015 to decrease due to plant closures associated with his client accounts.[2] By the time of trial, Husband had received two of his quarterly bonuses for 2015, which he stated were "in the neighborhood of [] $12,000" each. Husband also owns stock in Tencarva, which is a closely held corporation, and his 2014 K-1 reflected ordinary business income of $139,795.

Wife, who is 62 years old, has a graduate degree in anesthesiology and worked as a nurse anesthetist from the beginning of the marriage until 2002. She testified that she earned more income than Husband until around 1990. In addition to working full-time throughout the marriage, Wife noted that she raised four children with Husband, although she "did more" because Husband's job often took him out of town. In 1992, Wife began experiencing neck pain and was diagnosed with cervical scoliosis, for which she had surgery and was prescribed medication. Later, Wife was also diagnosed with fibromyalgia, chronic fatigue syndrome, and chronic myofascial pain syndrome, for which she saw several doctors, including a rheumatologist and psychiatrist. According to Wife, her psychiatrist treated her for mild depression associated with chronic pain and fatigue. Due to worsening symptoms, Wife left work beginning in the summer of 1994 but returned that fall after feeling "more rested." She continued working until 1996 when, she testified, "the pain became so bad . . . I needed pain medications, and I would not work taking pain medicines." Wife resumed work in 1997 and worked until 2002. Wife explained that she resigned from work because she experienced "chronic debilitating pain every day." According to a 2004 Social Security Administration decision, which was introduced at trial, Wife "met the disability insured status requirements of [the Social Security Act] on March 7, 2002" and was entitled to disability benefits from that date forward. At the time of trial, Wife received $1,720 in social security per month.

While Husband did not dispute that Wife had been diagnosed with several medical conditions, he testified that it was his understanding that Wife's employer "asked her not to work until she got [] her narcotics cleared up" and that Wife related to him that

---

[1]$44,400 annually.

[2]Husband's testimony concerning his anticipated decrease in income was less than clear. Husband's attorney asked, "So what has your – for example, between this year, 2014 and 2013, what was the differential in your income?" and Husband replied "It's probably gone down about $50,000." In his brief, Husband reported a "drop in income of about $50,000 from 2013 to 2014." However, both Husband's testimony and tax records, which were made exhibits, show that Husband's income from employment decreased by only $25,149 between 2013 and 2014.

she was told by her employer not to come back to work. Husband also testified at length about Wife's use of prescription medications and alcohol. According to Husband, he accepted Wife's use of "some heavy medication" for her fibromyalgia, but became increasingly concerned as he attributed a growing number of incidents, including social embarrassments, a police investigation for "doctor shopping," traffic violations, and a DUI resulting in Wife attending a week-long residential treatment center, to Wife's use of medications. While Husband admitted that as a result of the legal difficulties and treatments Wife "cut way back [on her medications]" for some time, he also testified that as recently as a couple of weeks before trial he observed Wife apply multiple Fentanyl patches to her skin at one time and on other occasions he observed Wife apply a patch inside her mouth.

Wife admitted to having issues managing her pain medication from time to time but denied that her use of medications caused her to resign from work. However, she testified that, in 1996, she was required to appear before the Tennessee Peer Assistance Program for Nurses concerning some of the medications she was prescribed. According to Wife, although she was not working at the time, she was required to attend weekly meetings for three years in order to keep her nursing and nurse anesthetist licenses. Wife did not dispute Husband's testimony that he had observed her with Fentanyl patches in her mouth and stated that she understood that the directions for the patches indicated that the patches were to be applied on the "[c]hest, back, flank, [or] upper or lower arm, where there is no hair." She noted that when she first began experiencing symptoms associated with her fibromyalgia that Husband was helpful but that over time he became "distant" and "verbally abusive" and ultimately ended up having a brief relationship with another woman.

Husband and Wife both testified concerning the value of their marital assets generally without disagreement but disputed the value of Tencarva stock that Husband had purchased throughout the marriage. Husband testified that, at the time of trial, he owned 450 shares of Tencarva stock, which the company valued at $2,050 per share the previous year. Husband stated that he multiplied his total shares by the previous year's value to determine that his stock was worth $922,500. However, he noted that the stock could be sold only to Tencarva or a current shareholder for 15% less than the asking price under the shareholder's agreement. David Costello, who testified as an expert CPA on Wife's behalf, valued Husband's stock at $1.3 million minus the 15% deduction for a total valuation of $1.1 million. Mr. Costello explained how he derived the value of Husband's stock:

> I [] had [Husband's] sworn testimony, and in his sworn testimony he stated
> that the stock was worth $922,500, and that was by taking the $2,050 per
> share that the company valued it at times 450 shares that he owns to

determine the $922,500. And I have to start with that number because what I did is I took the 2013 K-1 and the ordinary business income of $98,540 and divided it by that $922,500 to get a 10.68 percent return on his investment. In other words, he has a $922,500 value based on the company's numbers, and then he received $98,540 based on that value. And so I took that 10.68 percent and determined a value for 2014 just using a return of 10.68 percent on the $139,795 that appears on his 2014 K-1. And that indicates a value using 10.68 percent return of $1,308,000 rounded off. So just using the return that he received in 2013 and applying that to 2014, that indicates about a million-three.

Mr. Costello did admit, however, that because Tencarva was a privately held company that it was difficult to be precise with the value of the stock.

The court also heard testimony from Wife concerning her financial need. She testified that she receives about $1,720 per month in social security and introduced an income and expense statement showing a need of roughly $6,950 per month after accounting for her social security income. While Wife did not explain every item on her expense sheet, she did testify about several of the items. Among them, she noted that she was driving a roughly ten year-old vehicle with 70,000 miles on it and anticipated replacing it in the future. Additionally, Wife stated that she had medication costs of $2,500 per month without insurance ($250 per month with insurance) and a $4,000 insurance deductible. She explained that because the parties' agreed that Husband would keep the marital residence, she intended to purchase a condominium from her brother for $150,000 and expected to have a mortgage of $1,800 per month. In addition to the mortgage, Wife reported that she would be responsible for the $500 per month homeowner's association fee. She also estimated $550 per month in utilities but admitted that she had not been responsible for paying any bills since at least 2006.

The trial court issued a lengthy memorandum opinion on August 21, 2015, granting the parties a divorce on the ground of irreconcilable differences, dividing the parties' marital property, and setting spousal support. The court found "all the witnesses to be credible" but also "found [Wife] to be less forthcoming about her issues with pain medication . . . ." In its equitable division of the parties' property, the court considered the relevant factors under Tennessee Code Annotated section 36-4-121(c)(1) and made findings with respect to each of those factors. The court specifically found that Wife's "inability to work was not due to abuse of pain medications but instead was due to her chronic pain." With respect to Husband's Tencarva stock, the court found that Husband "put on no expert proof" and found that the value of the stock was "$1,100,000 based upon the expert's valuation at 1.3 million less 15% upon the resell back to the company as Husband testified." The court allocated assets to Wife totaling $833,543, nearly all of

4

which were retirement accounts, and to Husband totaling $1,407,786. Similarly, the court allocated debts to Husband totaling $92,143.

The court then considered each of the relevant factors under Tennessee Code Annotated section 36-5-121(i) in determining whether to award alimony. Included in its findings, the court specifically found that "as Wife began dealing with her health issues, she became dependent on her pain medications which led to some of the Parties' marital difficulties," but also found that "Husband had an affair," and determined that the relative fault of the parties did not "bear any weight for either Party" in determining alimony. The court ultimately found that "[Husband] has the ability to pay and [Wife] is a disadvantaged spouse in immediate need of income." While the court did not make a specific finding with respect to the amount of Wife's need, the court did find that transitional alimony in the amount of $1,000 per month plus one-half of Husband's quarterly bonuses for a period of four years would "soften the economic blow of the divorce." Additionally, the court awarded Wife $300,000 alimony in solido to make up the difference in the division of assets and also ordered Husband to purchase COBRA insurance for Wife for three years and pay the policy's annual $4,000 deductible. The court also awarded Wife half her attorney's fees.

On September 21, 2015, Husband filed a motion to alter or amend pursuant to Tennessee Rule of Civil Procedure 59, seeking to have the court reduce its award of alimony in solid. The court denied the motion, noting that the "alimony in solido award is appropriate in view of the disparity in the allocation of assets between the parties." Husband appealed.

**Issues**

Husband raises the following issues for review on appeal:

I.      Whether the trial court erred in calculating the spousal support awarded to Wife?

II.     Whether the trial court erred in calculating the value of Husband's stock in a closely-held corporation?

Wife raises two additional issues:

III.    Whether the trial court abused its discretion in not awarding Wife alimony in futuro.

5

IV. Whether Wife should receive her attorney's fees for this appeal.

## Standard of Review

In nonjury cases, this Court's review is *de novo* upon the record of the proceedings in the trial court, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are afforded no such presumption. *Campbell v. Florida Steel,* 919 S.W.2d 26, 35 (Tenn. 1996).

## Analysis

### A. *The amount of spousal support awarded*

Husband's first assignment of error concerns the amount of spousal support awarded by the trial court. Husband contends that the court abused its discretion in three respects. First, Husband argues that the court abused its discretion by disregarding Wife's fault in determining its award. Second, Husband argues the court abused its discretion by awarding a percentage, rather than a specific amount, of Husband's income as spousal support. Lastly, with respect to this issue, Husband argues that the court abused its discretion by "[relying] on doubtful or uncertain and vague statements or categorizations of [Wife's] purported needs." The Tennessee Supreme Court has articulated the standard of review applicable to a trial court's decision on matters of alimony:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce . . . the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor . . . ."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 606 (Tenn. 2004); *Burled v. Burled*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

> Equally well-established is the proposition that a trial court's decision

6

regarding spousal support is factually driven and involves the careful balancing of many factors. *Kennard v. Kennard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burled*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2012). As a result, "[a]appellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kennard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011) (footnote omitted).

Husband correctly notes that a party's relative fault is a relevant factor[3] that must be considered by a trial court in determining its award of spousal support. *See Jekot v. Jekot*, 232 S.W.3d 744, 752 (Tenn. Ct. App. 2007) (" . . . all of the above factors–to the extent relevant to the facts of a given case–should be considered in determining spousal support . . . ."). However, the record does not support Husband's allegation that the trial court disregarded this factor. Rather, the record reflects that the court considered the relevant evidence in light of that factor and determined that both parties contributed to the demise of the marriage to the extent that the factor did not "bear any weight for either

---

[3]*See* Tennessee Code Annotated section 36-5-121(i)(11).

Party." The evidence in the record simply does not preponderate against that finding. While Husband testified that Wife's struggles with pain medication played a role in the parties' deteriorating relationship, he also admitted to having an affair. Moreover, the evidence does not preponderate against the trial court's finding that Wife resigned from work due to chronic pain and not because of issues managing her pain medications. Clearly, the trial court did not disregard this factor nor did it abuse its discretion in determining that the factor favored neither party.

Husband also argues that the trial court abused its discretion by awarding a percentage of income as alimony[4], rather than a specific amount. We agree. The Tennessee Code states that in awarding alimony the court may award "some *definite* amount or amounts." Tenn. Code Ann. § 36-5-121(a) (emphasis added). In *Franklin v. Franklin*, this Court determined that a trial court abused its discretion in awarding a percentage of the defendant's bonus and modified that award by vacating the percentage award and increasing the specific award. *Franklin v. Franklin*, 746 S.W.2d 715, 718 (Tenn. Ct. App. 1987) ("'The percentage award has some problems, especially if the obligor's income rises substantially, as it may result in a higher standard of living than during the marriage'") (quoting Garret, *Tennessee Divorce, Alimony and Child Custody* § 13-5 (2d ed. 1984)). However, "[t]he Tennessee Supreme Court has reversed a spousal support award in part because the trial court had failed to consider the obligor spouse's overtime income, and this court has repeatedly approved spousal support awards in which the obligor spouse's overtime pay and annual bonuses were taken into consideration." *Davidson v. Davidson*, No. M2001-01830-COA-R3-CV, 2002 WL 31769205, at *7 (Tenn. Ct. App. Dec. 11, 2002) (internal citations omitted). Here, the trial court correctly included Husband's bonus pay in making its award of alimony but improperly awarded a percentage of that bonus income, rather than a specific amount. On remand, the trial court must take into consideration the evidence offered concerning Husband's bonuses and set a specific amount of alimony.

Husband's third argument with respect to this issue concerns Wife's need for alimony. While he admits that Wife has some need, he disputes some of the amounts to which Wife testified as well as other amounts listed in her expense sheet. In determining whether to award spousal support and, if so, the nature, amount, length, and manner of payment, courts must consider all relevant factors, including, to the extent that they are relevant, the statutory factors listed in Tennessee Code Annotated section 36-5-121(i). Although the court must consider each of the statutory factors relevant to the parties' circumstances, "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski,* 350 S.W.3d at 110 (citations omitted). Here, the trial court did not make a finding with respect to the

---

[4]Here, the court awarded half of Husband's quarterly bonuses as alimony.

specific amount of Wife's need. Because there is not a specific finding of the amount of Wife's need for this Court to review, we cannot possibly determine for which of the items listed in Wife's expense sheet that the trial court intended to provide alimony. This difficulty is compounded by the fact that the trial court's original award included a non-static amount based on Husband's bonuses. On remand, the trial court must determine the amount of Wife's need and make its award based on that determination. Accordingly, we vacate and remand the trial court's award of alimony.

## B. The value of Husband's stock

Next, Husband argues that the trial court erred in its valuation of Husband's Tencarva stock. The value of marital property is a question of fact. *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007). As fact finder, the trial court is free to place a value on a marital asset that is within the range of the evidence presented. *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). A trial court's valuation and distribution of marital assets will therefore be given great weight on appeal and will not be overturned unless the evidence preponderates against those findings or they are inconsistent with the factors outlined in Tennessee Code Annotated section 36-4-121(c). *Owens*, 241 S.W.3d at 486; *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998).

While Tennessee law recognizes a number of acceptable methods to calculate the value of a corporation, "it is particularly important . . . to note that 'determining the value of a closely held corporation is not an exact science. . . .'" *Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818, at *4 (Tenn. Ct. App. July 28, 2009) (quoting *Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn. Ct. App. 1995) (citation omitted)). Our supreme court has recognized three of these methodologies: (1) the market value method, (2) the asset value method, and (3) the earnings value or capitalization of earnings method. *Blasingame v. Am. Materials, Inc.*, 654 S.W.2d 659, 666 (Tenn. 1983), *superseded on other grounds by* Tenn. Code Ann. § 47-8-102 (1992 Repl. & Supp. 1998). As we noted in *Inzer*, the *Blasingame* court detailed the methods as follows:

> The market value method establishes the value of the share on the basis of the price for which a share is selling or could be sold to a willing buyer. The method is most reliable where there is an established market for the stock. The asset value method looks to the net assets of the corporation valued as a 'going concern,' each share having a pro rata value of the net assets. The net assets value depends on the real worth of the assets as determined by physical appraisals, accurate inventories, and realistic allowances for depreciation and obsolescence. The investment value method relates to the earning capacity of the corporation and involves an

9

attempt to predict its future income based primarily on its previous earnings record. Dividends paid by the corporation are considered in its investment value. Generally, all the elements involved in these methods are considered in determining the value of the dissenter's stock.

*Id.* (*quoting Brown v. Hedahl's-Q B & R, Inc.*, 185 N.W.2d 249, 254 (N.D. 1971)). In *Wallace v. Wallace*, we stated:

A public corporation's value is most reliably determined using the market value method. This method presumes that there is an established market for the corporation's stock which will enable the court to arrive at the price a willing buyer would pay for the stock. The stock in closely held corporations is rarely traded. Thus, it is improper to attempt to place a value on a closely held corporation using the method generally used to place a value on a public corporation.

*Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (citations omitted). Here, Husband testified only to the amount of shares he owned and the previous years' value of each of those shares. Husband's K-1 forms for the previous years are the only pieces of financial information in the record related to Tencarva. Wife's expert used the 2013 figures provided by Husband and Husband's K-1s in order to determine a 2014 value for the stock. Although the market value method is generally not preferred in valuing a closely held corporation, the trial court was provided with no additional evidence to assist its valuation. Because the trial court is free to place a value on a marital asset that is within the range of evidence presented, we conclude that the trial court did not abuse its discretion in valuing Husband's Tencarva stock.

## C. Alimony in futuro

Wife's sole assignment of error concerns whether the trial court abused its discretion by not awarding Wife alimony *in futuro*. As previously explained, appellate courts "decline to second guess a trial court's [award of spousal support] absent an abuse of discretion." *Gonsewski*, 350 S.W.3d at 105. The Tennessee Supreme Court noted in *Gonsewski* that "[t]he statutory framework for spousal support reflects a legislative preference favoring short-term spousal support over long-term spousal support, with the aim being to rehabilitate a spouse who is economically disadvantaged relative to the other spouse . . . ." *Id.* at 109. Indeed, Tennessee Code Annotated section 36-5-121(d)(2) states that "[i]t is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, wherever possible, by the granting of an order for payment of rehabilitative alimony." However, as this Court recently noted in *Owens v. Owens*, No. M2012-01186-COA-R3-CV, 2013 WL 3964793,

at *3 (Tenn. Ct. App. July 30, 2013), and reiterated in *Barnes v. Barnes*, No. 2012-02085-COA-R3-CV, 2014 WL 1413931, at *29 (Tenn. Ct. App. Apr. 10, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014), "[i]n determining how to measure a former spouse's economic rehabilitation, or its feasibility, it is important to note that the legislature has supplied the definition courts are to use[.]"  According to the statute,

> To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(d)(2).  Thus, as stated in *Barnes*, "[t]he basic question, then, is whether Wife can generate enough income to provide a pre-divorce standard of living, or one comparable to Husband's post-divorce standard of living."  *Barnes*, 2014 WL 1413931, at *29; *see also Owens*, 2013 WL 3964793, at *3.

Here, neither party testified explicitly to the standard of living enjoyed during the marriage.  However, the trial court awarded Wife over $800,000 in retirement accounts and ordered alimony to bridge the gap between the divorce and Wife turning 65, at which point she would be eligible for full social security retirement benefits.  Additionally, the court ordered Husband to pay Wife $300,000 cash in annual installments of $50,000.  Considering our deference to the trial court's decision with respect to this matter as well as the evidence in the record, we cannot say that the trial court abused its discretion in not awarding Wife alimony *in futuro*.

### D. Wife's Attorney's Fees for the Appeal

Finally, Wife argues that she should be granted an award of attorney's fees incurred in defending this appeal.  This Court has noted:

> Our supreme court has defined the factors that should be applied when considering a request for attorney fees incurred on appeal.  These factors include the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered.

*Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at *17 (Tenn. Ct. App. June 29, 2015) (*no perm. app. filed*) (quoting *Dulin v. Dulin*, No. W2001-02969-

COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003)).

Considering these factors, we conclude that Wife is not entitled to an award of her attorney's fees incurred on this appeal. Husband was successful in challenging the amount of alimony awarded in several respects, and the appeal was sought in good faith. Moreover, although Husband's appeal was unsuccessful with respect to his challenging the court's valuation of his Tencarva stock, this Court has held that "'[w]here both parties are partially successful on appeal, . . . no counsel fees should be awarded [with] respect to the appeal.'" *Barrentine v. Barrentine*, No. W2005-02082-COA-R3-CV, 2006 WL 2613535, at *6 (Tenn. Ct. App. Sept. 13, 2006) (quoting *Baggett v. Baggett*, 512 S.W.2d 292, 294 (Tenn. Ct. App. 1973)). As such, we decline to award Wife her attorney's fees incurred on appeal.

## Conclusion

For these reasons, the judgment of the trial court is affirmed in part and vacated and remanded in part to the trial court for additional proceedings consistent with this opinion. Costs of this appeal are taxed one-half to the appellee, Rebecca Bettis, and one-half to the appellant, Norris Bettis, and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE